**PACIFICORP CAPITAL, INC., Plaintiff,**

v.

**The CITY OF NEW YORK and Joseph A. Messina, Executive Director of Financial Information Services Agency of the City of New York, Defendants,**

**and**

**International Business Machines Corporation, Defendant–Intervenor.**

**No. 90 Civ. 0626 (MGC).**

United States District Court, S.D. New York.

July 16, 1990.

---

Michael E. Geltner, Washington, D.C., Dasil E. Velez, Bellmore, N.Y., for plaintiff.

Victor A. Kovner, Corp. Counsel by Susan Shapiro, Rick Brodsky, New York City, for defendants.

Seward & Kissel by Mark J. Hyland, Brian J. Kearney, New York City, for defendant-intervenor.

## OPINION

CEDARBAUM, District Judge.

PacifiCorp Capital, Inc. commenced this diversity action against the City of New York and City official Joseph A. Messina to

enjoin payment on a contract for the purchase of computer equipment from the International Business Machines Corporation ("IBM"). PacifiCorp seeks both a preliminary and a permanent injunction against the award of the contract to IBM, and asks for a permanent injunction awarding the contract to PacifiCorp based on its proposal of an Amdahl 5890–400E computer. All parties consented to IBM's motion to intervene as a defendant.

In accordance with Fed.R.Civ.P. 65(a)(2) and upon the consent of the parties, the evidence in this case was presented during a one-day consolidated preliminary and final injunction hearing. In addition, prior to the bench trial, PacifiCorp and the City submitted a stipulation of facts, and, as a result, most of the facts are undisputed. As will be discussed more fully below, after carefully considering all the evidence and evaluating the credibility of the witnesses, I find that the award of the contract to IBM was not in accordance with the requirements of the state and local law. Accordingly, the award of the contract is vacated, and the City is directed to award the contract in accordance with the requirements of Section 343 of the City Charter.

## The Facts

PacifiCorp is a corporation organized under the laws of the state of Virginia and has its principal place of business in Virginia. PacifiCorp is a third party vendor of computers; it leases and sells computers it acquires from others. The City is a municipal corporation organized under the laws of New York State. Defendant Joseph A. Messina is Executive Director of the Financial Information Services Agency ("FISA") of the City. He is sued in his official capacity. Defendant–Intervenor IBM is a New York corporation with its principal place of business in New York. IBM is primarily engaged in the business of manufacturing, selling and leasing computers and computer parts, including software.

FISA is responsible for the computerization of all of the City's fiscal affairs. In addition to its original responsibilities, FISA's duties now include the management of the City's payroll system and the development and implementation of a comprehensive tracking system to monitor and report on all City contracts and vendors.

Recognizing its need to improve and modernize its computer mainframe central processing unit ("CPU") in order to carry out all of its responsibilities, on November 1, 1989 FISA issued a Request for Proposals ("RFP") that solicited proposals for an improved CPU, specifically an IBM model 3090–400E or equivalent, and for an optional upgrade of the IBM Model 400E to an IBM Model 400S or equivalent. An upgrade is a process by which additional features or equipment are added to an existing processor so as to enable it to perform greater or different functions.

The CPU was part of a procurement involving the purchase of hardware, software and maintenance. FISA concluded that it was not required to use competitive bidding for the CPU, and issued an RFP to facilitate the procurement.

The RFP invited proposers to offer either new or used equipment. Proposals were due November 21, 1989. The RFP contained detailed specifications for the equipment and listed the required hardware and software components and features. In addition, the RFP requested that the proposer state the environmental and technical characteristics of the CPU it was proposing.

Four vendors submitted timely proposals —IBM, PacifiCorp, Cashflow Design, Inc. and Amdahl Corporation. PacifiCorp submitted two proposals, one for IBM equipment and one for Amdahl equipment. PacifiCorp's IBM proposal offered an IBM 3090–400E for a price of $5,370,500, with trade in prices totalling $265,000 for FISA's current equipment. FISA evaluated the cost to it of PacifiCorp's IBM proposal based on the cost of the initial processor (excluding the upgrade) and found an adjusted total cost of $7,485,037 after adding costs for delivery and installation, five-year maintenance, energy cost and software.

PacifiCorp's Amdahl proposal offered an Amdahl 5890–400E for a price of $3,491,263 with an upgrade to the Amdahl 5890–600E. FISA evaluated the cost to it of Pacifi-

Corp's Amdahl proposal based on the cost of the initial processor (excluding the upgrade) and found an adjusted total cost of $7,330,807, adding costs for delivery and installation, five-year maintenance, energy cost and software and an additional $1,879,237 for "residual value difference."

FISA added the same $1,879,237 for "residual value difference" to Amdahl's proposal for the same machine, and FISA evaluated the total cost of the Amdahl proposal to it based on the initial processor (excluding the upgrade) as $7,483,157.

The basis for FISA's conclusion that there was a residual value difference of $1,879,237 to be added to Amdahl's proposal and PacifiCorp's Amdahl proposal was that that figure represented the difference between the price quoted by PacifiCorp for the IBM 3090–400E Processor Complex and the price quoted by PacifiCorp for the Amdahl 5890–400E Processor Complex. Since in FISA's capacity study, the necessity for an upgrade had been forecast, FISA treated the prices that PacifiCorp proposed for the IBM and Amdahl 400E units as representing what it could expect in a trade for them at the time of upgrade. The difference in price between the two units represented what FISA felt was the difference in trade-in value, or the "residual value difference."

FISA evaluated the total adjusted cost of IBM's proposal for an IBM 3090–400E as $6,606,279, after taking into account maintenance and energy costs. After FISA made the $1,879,237 addition to PacifiCorp's Amdahl proposal and to Amdahl's proposal, FISA determined that IBM offered FISA the lowest cost proposal.

FISA submitted a report to the Department of General Services, which in turn submitted a report to the Office of Management and Budget, which in turn submitted a report to the Board of Estimate requesting the Board of Estimate's approval of the award to IBM. After receiving and evaluating all the proposals, the City's budgetary constraints forced FISA to reconsider its upgrade plans and to eliminate the upgrade and limit the procurement to the purchase of the IBM 3090–

400E or equivalent. As a result, FISA based its award decision solely on the "E" level processor and did not consider the upgrade. FISA did not announce this change to the offering companies, nor did FISA revise any of the reports that it had submitted to the Department of General Services and the Office of Management and Budget which it knew would go to the Board of Estimate. Consequently, the report ultimately submitted to the Board of Estimate by the Office of Management and Budget was both outdated and inaccurate. For example, the report to the Board of Estimate stated that PacifiCorp's Amdahl proposal had been eliminated because its proposed upgrade was not responsive. In fact, PacifiCorp's Amdahl proposal had not been disqualified.

On January 25, 1990, the Board of Estimate adopted a resolution approving the award to IBM. PacifiCorp was informed of the decision on January 26, 1990. FISA concluded that it was in the City's best interest to obtain delivery of the CPU by January 31, 1990. The IBM 3090–400E was delivered and installed by IBM at FISA's facilities on the weekend of January 27 and 28, 1990. Installation was required over the weekend because computer operations are slowest at that time.

### Discussion

A. *New York General Municipal Law Section 103 and its Exceptions*

■ PacifiCorp claims that it is entitled to injunctive relief because the award of the contract violated section 103 of the New York General Municipal Law ("GML") and was arbitrary and capricious. GML section 103 requires competitive bidding for municipal contracts. Under that statute, all municipal purchase contracts involving an expenditure of more than five thousand dollars must be awarded to the lowest responsible bidder. There are two exceptions to this requirement. The first, known as the "service" exception, was developed as a judicial gloss on GML section 103. The New York courts have construed section 103 as inapplicable to municipal contracts which require special skill and expertise. The second is an express exception in the

statute for local laws enacted prior to September 1, 1953. Although PacifiCorp argues that these exceptions are coextensive, nothing in the statutory language or history supports that contention. Each of these exceptions will be considered in turn.

### 1. The "Service" Exception

All parties recognize that the New York courts have exempted "service" contracts from the competitive bidding requirement of GML section 103. Under New York law, when a municipality is purchasing services which require scientific knowledge, skill, expertise and experience, it is not required to award the contract to the lowest bidder. This "service" exception dates back to the New York Court of Appeals decision in *People, ex rel. Smith v. Flagg*, 17 N.Y. 584 (1858) and has been applied by the New York courts in several cases. *See, e.g., Burroughs Corp. v. New York State Higher Education Services Corp.*, 91 A.D.2d 1078, 458 N.Y.S.2d 702 (3d Dep't 1983); *American Totalisator Co., Inc. v. Western Regional Off–Track Betting Corp.*, 44 A.D.2d 750, 396 N.Y.S.2d 301 (4th Dep't 1974).

The defendants rely particularly on *Burroughs*, a case in which the court found that the purchase of computer hardware and software fell within the service exception to the competitive bidding requirement. The facts and the RFP in *Burroughs* showed that in that case the government agency was seeking the design of a computer system to meet its future needs:

> Both the RFP and the undisputed facts contained in the record establish that, rather than a group of physical articles of electronic hardware, [the governmental agency] primarily was seeking the design of a computer system which would provide prompt, efficient, cost-effective computer services to satisfy its growing and increasingly complex needs for the next five years. Such a design required the employment of the highest skills in the field of computer science. Vendors were allowed considerable discretion in the RFP in proposing the hardware and software components of the system, and they were also encouraged by [agency] officials to be innovative and flexible in meeting the required specifications in their design proposals.

*Burroughs*, 91 A.D.2d at 1078–80, 458 N.Y.S.2d 702.

Although the defendants contend that the award of this computer contract to IBM falls within the service exception and is governed by *Burroughs*, the RFP and facts of this case do not suggest that the City was seeking the design of a computer system. On the contrary, an examination of the RFP and the other evidence shows that the City knew the specific type of computer equipment it needed to meet its needs, namely an IBM 3090–400E or equivalent. FISA had conducted its own study of its computer needs and had hired an independent consultant, Systems Methods Associates ("SMA"), to perform a capacity study for FISA. *See* Defendant's Exhibit A. Both FISA and SMA specifically recommended that the City procure an IBM 3090–400E or equivalent. The proposers had little discretion under the RFP in selecting the hardware or software. The RFP did not invite innovative design proposals for a computer system. The only services which the RFP called for were installation and maintenance, services which accompany many machine purchases.

According to Mr. Messina's testimony, competitive bidding should be used either when the City seeks to purchase a specific item, or when the City can bid out a detailed list of specifications. When competitive bidding is used, the contract must be awarded to the lowest responsible bidder. Messina testified that his staff recommended that the procurement be by RFP,

> Primarily because there are a few manufacturers of computers and a few vendors that sell different manufacturers and we were looking for the best proposal for the city, also being that we could not clearly state the definite specifications as it pertains to the environmentals needed to support that computer.

Transcript at 13. In this case, the City's RFP was very specific and did not ask for

**486**

proposed designs for FISA's computer system. While I do not reach the question of whether this contract must be competitively bid, I find that this contract does not fall within the service exception to the bidding requirements of section 103.

2. City Charter Section 343

■ GML section 103(1) states that it is applicable "[e]xcept as otherwise expressly provided by an act of the legislature or by a local law adopted prior to September first, nineteen hundred fifty-three ..." N.Y.Gen.Mun.Law § 103(1) (McKinney 1990). City Charter section 343 is such a local law and applies to the facts of this case.

City Charter section 343(a) provides:

If the several parts of the work, labor or the supplies, materials and equipment to be done or furnished shall together involve the expenditure of more than five thousand dollars, or in the case of construction, repair, rehabilitation or alteration, the expenditure of more than fifteen thousand dollars, such work or labor or supplies, material, and equipment or construction, repair, rehabilitation or alteration shall be obtained only by contract on public letting founded on sealed bids under such regulations as shall be made by the board of estimate, *except that in a special case the board of estimate by a two-thirds vote may order otherwise.*

N.Y.City Charter § 343(a) (emphasis added). The City argues that the RFP process used in the procurement of this contract was done pursuant to the "special case" exception of City Charter section 343(a). The City appears to argue that all computer procurements are special cases within the meaning of section 343. As discussed above, PacifiCorp contends that if, as I have determined, the contract does not come within the "service" exception to GML section 103, it cannot be a special case within the meaning of City Charter section 343. As discussed above, I reject PacifiCorp's contention that a special case is limited to GML section 103's service exception. I turn then to the special case exception to competitive bidding.

■ Few New York courts have addressed the question of what constitutes a special case under City Charter section 343. As both PacifiCorp and the City recognize, a special case exists when only one manufacturer or producer can supply the product. *See Tinston v. City of New York*, 17 A.D.2d 311, 234 N.Y.S.2d 730 (1st Dep't 1962), *aff'd*, 13 N.Y.2d 850, 242 N.Y.S.2d 490, 192 N.E.2d 271 (1963); *Matter of Wade Electrical Contracting Co., Inc. v. Davis*, No. 15576/82 (Sup.Ct.N.Y.Co. July 28, 1982). That is not the situation here. A special case has also been held to exist when the lowest bidder has given a prohibited gift to a public official. *See Kayfield Constr. Corp. v. Morris*, 15 A.D.2d 373, 225 N.Y.S.2d 507 (1st Dep't 1962). No similar allegation is made here. In addition, time pressure sometimes justifies a special case exception to the competitive bidding requirement. *See Cascione v. Morris*, 40 Misc.2d 431, 243 N.Y.S.2d 67 (Sup.Ct.Queens Co.1963). The evidence in this case, however, does not suggest that only IBM could provide the computer in the time frame set out in the RFP, nor has the City made that allegation.

When contracts are competitively bid, they must be awarded to the lowest bidder. Although neither the statute nor the decisions clearly define the special case exception, both clearly suggest that a special case is limited to circumstances in which it can be demonstrated that it is impractical and inappropriate for price alone to be the determining factor.

The decisions of the New York Court of Appeals which construed the predecessor statutes to City Charter section 343 are perhaps the best guide to the proper application of the special case exception. *See Matter of Emigrant Industrial Savings Bank*, 75 N.Y. 388 (1878); *Phelps v. Mayor*, 112 N.Y. 216, 19 N.E. 408 (1889). Although the earlier versions of the statute did not contain the words "special case," the decisions themselves used those words to describe the circumstances in which competitive bidding was not required. "As cases might arise where from the nature of the work, or other circumstances, it would

be either impracticable or unsuitable to contract for the work or supplies in that manner [i.e. via competitive bids], a discretion was lodged in the common council impowering them to direct otherwise in *special cases ...*" *Matter of Emigrant Industrial Savings Bank,* 75 N.Y. 388, 394 (1878) (emphasis added). *See also James Shewan & Sons, Inc. v. William Wirt Mills,* 211 A.D. 687, 693, 208 N.Y.S. 381, 385 (1st Dep't 1925) ("The charter provision was intended to limit the departure from the wholesome requirement for public letting to such particular and specific cases as to the board of alderman might seem to justify a relaxation of the rule in a special case.")

█ These early decisions do not provide a specific definition of "special case," but they do make clear that the Board of Estimate must decide on a case-by-case basis whether to dispense with the requirement of competitive bidding.

> The law confers upon the common council the power and duty of deciding in each particular case whether [the provisions of the charter requiring advertisement for sealed proposals and a contract with the lowest bidder] shall be dispensed with, and requires a vote of three-fourths of all the members elected to accomplish that purpose. This is eminently a discretionary power which cannot be delegated. It is their judgment which the law requires and not that of any officer they may designate. There is no provision in the law itself authorizing them to delegate this power, and the case falls within the settled principle that powers of this description, involving the exercise of judgment and discretion cannot be delegated....

*Matter of Emigrant Industrial Savings Bank,* 75 N.Y. 388, 393 (1878); *see also Phelps v. Mayor,* 112 N.Y. 216, 219–20, 19 N.E. 408 (1889); *James Shewan & Sons, Inc. v. William Wirt Mills,* 211 A.D. 687, 691, 208 N.Y.S. 381 (1st Dep't 1925). Thus, the City's contention that all computer contracts are special cases under section 343 is not supported by the law. Only the Board of Estimate can determine what constitutes

a special case, and it can do so only on a case-by-case basis.

The evidence shows that the Board of Estimate did not have sufficient factual information to exercise its judgment when it awarded this contract pursuant to the special case exception. Although the language of the Board of Estimate resolution recites that the contract is awarded pursuant to City Charter section 343(a), it also states that the contract is awarded without public letting in accordance with the report of the Deputy Director of Management and Budget. That report (Defendant's Exhibit J) does not attempt to explain to the Board of Estimate why this procurement should be treated as a special case by the Board. Both Mr. Messina's testimony and the Guidelines for Mayoral Agency Contracting make clear that in some situations competitive bidding is not the most desirable procurement method:

> The term "special case" applies to those situations for which competitive sealed bidding would not be suitable.
>
> \*    \*    \*    \*    \*    \*
>
> While competitive sealed bidding is used for procurements when competition can be based on price alone, the RFP process is a valuable means of ensuring that specialized experience, professional skills and innovation are also given consideration when selecting a contractor. When the requirements of a project are not sufficiently defined for the use of competitive sealed bidding, the RFP process is appropriate for soliciting the information the agency requires to select a contractor.

Guidelines for Mayoral Agency Contracting, Part II, Ch. 1, 1 (1989). The report sent to the Board of Estimate in this case did not advise the Board that this procurement should not be based on price alone. Nor did it identify any other circumstances that made this procurement a special case. Rather, it appears that FISA determined that this was a special case, and did not seek the Board of Estimate's determination on the question as the law requires.

Even if the report to the Board of Estimate is generously interpreted as presenting an overall explanation of why this is a special case, the information contained in that report was inaccurate and thus could not properly serve as the basis for the Board of Estimate's special case determination. The report to the Board of Estimate was misleading because it stated that PacifiCorp's Amdahl proposal had been eliminated based on its conclusion that the proposed upgrade was not responsive. "FISA eliminated the Cashflow Design, PCC [PacifiCorp], and Amdahl proposals of 5890 processors from further consideration because they were deemed non-responsive with respect to not offering "S" Level technology." Defendant's Exhibit J at 2. However, as noted earlier, FISA had decided to eliminate the upgrade from its consideration and, as a result, PacifiCorp's Amdahl proposal was not disqualified. Mr. Messina acknowledged that the report was erroneous in this regard.

In addition, in that report, IBM is clearly presented as the lowest bidder due to the irrational residual value difference calculation. The residual value of a computer represents today's best estimate of the amount of money that the City could anticipate receiving for the disposition of the computer at some future date. As discussed above, the City used the difference between PacifiCorp's proposed prices for both the Amdahl and IBM models to determine the residual value and compute the total cost of PacifiCorp's proposals. However, the testimony of Robert Townsend, Deputy Executive Director of Computer Systems at FISA, Brian Battle, Executive Vice President of PacifiCorp, and Jan Halvorsen, Vice President of Gartner Group Inc., an information technology consulting firm, showed that this method of computation was arbitrary and capricious.

Mr. Townsend testified that using PacifiCorp's proposed prices to determine the residual value was his idea. He did not consult with the proposers or his staff regarding this calculation; it just "dawned on" him. Transcript at 128. Mr. Townsend concluded that since the City would need an upgrade some time in the near future, he had to take into account the residual value difference between the two computers. To calculate the residual value, he just decided to use the difference between PacifiCorp's proposed prices. He then added that number to the proposed prices for the Amdahl machines to determine the total cost of both PacifiCorp and Amdahl's proposals for Amdahl equipment. Mr. Townsend admitted that he did not know when the City would need to upgrade. In addition, Mr. Townsend made no attempt to survey the trade-in values of the machines or to calculate what the machines might be worth at any particular point in time. Nor did he take into account the time value of money.

The testimony of Mr. Battle and Ms. Halvorsen demonstrated that this method of computing residual value was irrational. It was not rational to take the difference between the PacifiCorp bids and assume that the residual value difference would be equal to the absolute difference in the prices proposed by one supplier at one moment in time no matter when the City decided to dispose of the equipment. As Ms. Halvorsen testified, residual value computations begin with average selling prices, not the price of one vendor who may have received a good or bad deal for a particular machine. Nor was it rational to assume that the absolute difference in price would remain constant over time. Finally, it was irrational to ignore the time value of money in making the calculation.

The report's reliance on that calculation was particularly problematic because, as Mr. Townsend testified, the Board of Estimate was interested primarily in cost. Transcript at 110. The presentation of the residual value difference figure in the report also was confusing because most of the other numbers presented assumed a five-year procurement while the residual value calculation assumed a much shorter term procurement. Defendant's Exhibit J at 3.

Thus, even if the Board of Estimate were using this report to determine if this was a special case, it is unlikely that the Board of Estimate knew it was awarding the con-

tract to anyone other than the lowest bidder. Nor is it clear that the Board of Estimate even knew that PacifiCorp's Amdahl proposal was still under consideration.

In sum, under City Charter section 343, the Board of Estimate has the power to award contracts without public letting in special cases. While the decisions do not define what constitutes a special case, City Charter section 343 does require that the Board of Estimate exercise its discretion to award a contract pursuant to this exception. In this case, the Board of Estimate was not asked to exercise its discretionary power nor did it have sufficient information for that purpose. The information presented to the Board of Estimate about this procurement did not explain why this procurement was a special case. Moreover, the information provided was inaccurate and cannot properly serve as a basis for a special case determination. Since the Board of Estimate was not able properly to consider whether this contract should be awarded pursuant to the special case exception, the contract award did not comply with the requirements of City Charter section 343.

### Conclusion

Accordingly, the award of the contract to IBM is vacated and the City is directed to award the contract in accordance with the statutory requirements.

The foregoing opinion shall constitute my findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52.

SO ORDERED.