**UNITED STATES of America,**
**Plaintiff–Appellee,**

**State of New York, Plaintiffs,**

v.

**CITY OF NEW YORK and New York City Department of Environmental Protection, Defendants.**

**Carolyn MALONEY, Individually, and as member of the New York City Council, Petitioner–Appellant,**

**Fernando Ferrer, Intervenor,**

v.

**CITY OF NEW YORK, New York City Department of Environmental Protection, Albert F. Appleton, Commissioner of the New York City Department of Environmental Protection, Chambers Services, Inc., New York Organic Fertilizer Company, Merco Joint Venture, and Renewable Earth Products of New York City, Respondents–Appellees.**

No. 1708, Docket 92–6074.

United States Court of Appeals, Second Circuit.

Argued June 3, 1992.

Decided July 22, 1992.

Filed Aug. 11, 1992.

S. Mac Gutman (Halima A. Gutman, Gutman & Gutman, Forest Hills, N.Y., of counsel) for petitioner-appellants.

O. Peter Sherwood, Corp. Counsel, New York City (Leonard Koerner, Lewis Finkelman, Helen P. Brown, of counsel), for Mun. appellees.

Alvin K. Hellerstein (Stroock & Stroock & Lavan, New York City, of counsel) for respondent-appellee New York Organic Fertilizer Co.

Paul A. Winick (Thelen, Marrin, Johnson & Bridges, New York City, of counsel) for respondent-appellee Chambers Services, Inc.

K. Richard Marcus (Vincent Torna, McDonough Marcus Cohen & Tretter, P.C., of counsel) for respondent-appellee Merco Joint Venture.

Deborah B. Zwany, Asst. U.S. Atty., E.D.N.Y. (Andrew J. Maloney, U.S. Atty., Robert L. Begleiter, Robin L. Greenwald, Asst. U.S. Attys., E.D.N.Y., Richard J. Weisberg, Asst. Regional Counsel, U.S. E.P.A., of counsel) for appellee U.S.

Before LUMBARD, VAN GRAAFEILAND and WALKER, Circuit Judges.

WALKER, Circuit Judge:

■ This case presents an intriguing question of first impression in this circuit and one not addressed below: do municipal taxpayers have standing to challenge the legality of municipal expenditures without establishing that a declaration that the expenditures are illegal will likely yield any savings to the taxpayer? Because controlling Supreme Court precedent grants a unique status to municipal taxpayer actions, we hold that municipal taxpayers do have standing to challenge municipal expenditures even where there is no likelihood that resulting savings will inure to the benefit of the taxpayer. Accordingly, we affirm the judgment of the district court, largely on the strength of the opinion below. We choose to write principally to address the standing question.

I

Of the nearly two billion gallons of wastewater produced in New York City (the City) every day, approximately 335,000 cubic feet (10,700 wet tons) is sludge. What to do with that staggering volume of waste is the underlying subject of this lawsuit.

From 1938 to 1986, the City dumped its sludge in the ocean, at a site just twelve miles offshore. Growing concerns about degradation of the marine environment and about sludge washing up on local beaches led Congress in 1977 to order municipalities to cease by December 31, 1981 all ocean dumping that "unreasonably degrade[s] the marine environment." 33 U.S.C. § 1412a.

The City, unable to develop an environmentally sound alternative, argued that its ocean dumping was reasonable because ocean dumping would produce fewer environmental harms than the available land-based options. This position prevailed in court, *see City of New York v. EPA*, 543 F.Supp. 1084 (S.D.N.Y.1981), and the City continued ocean dumping, though after 1986 at a site 106 miles offshore.

In 1988, Congress passed the Ocean Dumping Ban Act, 33 U.S.C. §§ 1412–16, outlawing all ocean dumping after December 31, 1991, and requiring municipalities either to stop dumping by August 14, 1989 or to enter into a consent decree with the Environmental Protection Agency (EPA) to create a plan to phase out all ocean dumping by the end of 1991.

On August 10, 1989, the City entered into a consent decree with the EPA establishing a schedule for the termination of ocean dumping. The decree, approved by the District Court for the Eastern District of New York, required the City to cease all ocean dumping by June 30, 1992. The decree also set forth a complex series of timetables to insure that the City would be able to meet this obligation.

First, the decree required the City to construct dewatering facilities capable of processing 20% of the City's sludge by the end of 1991 and 100% of the sludge by June 30, 1992. Second, the decree required the

City to solicit proposals for land-based management of the sewage sludge, and established a schedule for evaluating those proposals. Third, the decree required the City to "have fully executed contracts ... for the interim land-based management of the City's sewage sludge by September 15, 1991." Finally, the decree ordered the City to develop a long term plan for sludge management.

Presented with these clear instructions, the City began the task of building dewatering plants, letting contracts to implement the interim land-based plan, and developing a long term strategy. This appeal focuses on the process by which the City let contracts for the interim land-based plan.

Because of the size and complexity of the problem, the City did not simply announce how much sludge it would need disposed of and open the floor for competitive bidding. Instead, the City pursued a thoughtful and comprehensive strategy designed to yield an environmentally sound land-based alternative to ocean dumping. The contracting process went forward as follows.

First, the City distributed requests for proposals (RFP), inviting interested companies to submit an outline of their planned sludge management plan. The City received thirty-nine proposals, and determined that twenty-four were sufficiently qualified to warrant further inquiry. The City then distributed a second stage RFP, requesting the twenty-four qualified proposers to present more detailed information.

Eleven of the twenty-four submitted proposals. In addition, one company not included in the original thirty-nine made a submission. After reviewing the twelve proposals, the City invited each company in for an interview, after which the company had thirty days to revise its proposal. The City received nine revised proposals and evaluated each according to stringent criteria laid out in the second stage RFP. After this technical evaluation, the City reviewed the sealed cost proposals of each of the companies. In the end, the City advised five of the proponents that the City would negotiate contracts with them.

After extensive negotiations, the City eventually came to terms with three organizations, Chambers Services, Inc. (Chambers), New York Organic Fertilizer Company (NYOFCO), and Merco Joint Venture (Merco). The City Comptroller registered the NYOFCO and Chambers contracts on September 13, 1991, and the Merco contract on September 18, 1991. With these contracts, the City complied with its obligation under the consent decree to arrange for an interim land-based sludge management system, and set the stage to begin reducing ocean dumping by 20% by December 31, 1991, and to end ocean dumping entirely by June 30, 1992.

## II

On October 29, 1991, plaintiff Carolyn Maloney, a New York City taxpayer and member of the City Council (who faced an election in six days), brought an Article 78 proceeding in state court against the City, the Department of Environmental Protection (DEP), and DEP commissioner Albert Appleton, seeking to void the City's contracts with Merco, Chambers, and NYOFCO.

In order to prevail in an Article 78 proceeding, New York law requires the plaintiff to establish that a challenged administrative action "was made in violation of lawful procedure, was affected by an error of law or was arbitrary and capricious or an abuse of discretion." N.Y.C.P.L.R. § 7803(3). Maloney alleged that the contracts were unlawful because the City failed to submit the contracts for competitive bidding, as required by General Municipal Law (G.M.L.) § 103(1).

G.M.L. § 103(1) provides that:

Except as otherwise expressly provided by an act of the legislature or by a local law adopted prior to September first, nineteen hundred fifty-three, all contracts for public work involving an expenditure of more than twenty thousand dollars and all purchase contracts involving an expenditure of more than ten thousand dollars, shall be awarded ... to the lowest responsible bidder furnishing

the requested security after advertisements for sealed bids in the manner provided in this section.

Although Maloney's claims sounded entirely in state law, and although there was no diversity of citizenship between the parties, the City immediately sought to remove the case to the United States District Court for the Eastern District of New York.

On November 27, 1991, Judge Mishler, the same judge who presided over the consent decree, removed the action to federal court pursuant to his power under the All Writs Act, 28 U.S.C. § 1651, to adjudicate state law actions that threaten the integrity of federal consent decrees. *See Yonkers Racing Corp. v. City of Yonkers*, 858 F.2d 855, 863–64 (2d Cir.1988), *cert. denied*, 489 U.S. 1077, 109 S.Ct. 1527, 103 L.Ed.2d 833 (1989); *Ludlow Park Homeowners Ass'n v. County of Westchester*, 741 F.Supp. 1126, 1129 (S.D.N.Y.1990), *aff'd*, 930 F.2d 909 (2d Cir.), *cert. denied*, — U.S. ——, 112 S.Ct. 61, 116 L.Ed.2d 37 (1991). The court also allowed the three contracting companies, Chambers, Merco, and NYOFCO to intervene on the side of the city defendants. Fernando Ferrer, the Bronx Borough President, intervened in support of Maloney.

Judge Mishler referred the case to Magistrate Judge Orenstein, and defendants moved for summary judgment. On December 27, 1991, Magistrate Judge Orenstein issued a thoughtful and comprehensive fifty-five page report recommending summary judgment for the defendants.

In that report, the Magistrate Judge described his task as "not … to determine whether the City negotiated well, or whether the price is too high or too low." Instead, the Magistrate Judge examined the record only "to scrutinize the process and consider whether the City should have proceeded [by competitive bidding] or whether the facts and circumstances permitted proceeding under a recognized exception to the General Municipal Law and whether the City acted in accordance with the steps required under such exception."

The Magistrate Judge concluded that all three of the contracts fell within one of the two recognized exceptions to the general requirement that municipal contracts be let by competitive bidding. The Magistrate Judge's analysis focused particularly on *Pacificorp Capital, Inc. v. City of New York*, 741 F.Supp. 481, 484–89 (S.D.N.Y. 1990). In *Pacificorp*, Judge Cedarbaum parsed New York case law and discerned two situations in which G.M.L. § 103(1)'s requirement of competitive bidding did not apply.

First, "when a municipality is purchasing services which require scientific knowledge, skill, expertise and experience, it is not required to award the contract to the lowest bidder." *Id.* at 484. This so called "service contract" exception dates back to *People ex rel. Smith v. Flagg*, 17 N.Y. 584 (1858).

The *Pacificorp* court also noted a second exception to competitive bidding where the board of estimate determines by a two thirds vote that a "special case" exists. While New York case law does not precisely define the contours of the "special case" exception, the *Pacificorp* court suggested that the decision was a discretionary one that required a determination by the board of estimate that particular circumstances justified dispensing with competitive bidding.

*Pacificorp* interpreted New York law in the context of the New York City charter then in existence. Since *Pacificorp*, and in the midst of the contracting at issue here, the City adopted a new charter. The Magistrate Judge found that the new charter incorporated the service contract exception in § 312(b)(1)(i), which provides that competitive bidding shall not be required where "specifications cannot be made sufficiently definite and certain to permit selection based on price alone." The Magistrate Judge determined that the new charter retained the "special case" exception in a provision stating that competitive bidding is not required where "judgment is required in evaluating competing proposals, and it is in the best judgment of the city to require a balancing of price, quality, and other factors." New Charter § 312(b)(1)(ii).

Having concluded that the new charter retained both exceptions to the competitive bidding requirement recognized in *Pacificorp*, the Magistrate Judge determined that these contracts fell within the terms of the new "special case" exception. The Magistrate Judge reasoned that evaluating the competing proposals required judgment because "[t]he City sought a design of a flexible sludge disposal system which would provide an efficient, cost-effective disposal program which would satisfy the City's growing and increasingly complex needs until a long term disposal program could be implemented." Moreover, the Magistrate Judge found that, to the extent practicable, given that the City began the contracting process under the old charter and completed it under the new, the City had complied with the contracting requirements of both charters.

Finally, the Magistrate Judge rejected Maloney's assertion that the new charter ran afoul of G.M.L. § 103(1). G.M.L. § 103(1) preempts all local laws purporting to create exceptions from competitive bidding unless the local law was "enacted prior to September 1, 1953." Reasoning that the new charter was a "recodification; restatement and revision of pre-September 1, 1953 provisions," *see* New York State Comptroller Opinion No. 81–109 (April 14, 1981), the Magistrate Judge determined that G.M.L. § 103(1) did not preempt the new charter's competitive bidding exceptions. Accordingly, the Magistrate Judge recommended that the district court uphold the validity of the contracts and grant summary judgment to the defendants.

Maloney promptly filed objections to the Magistrate Judge's opinion. The district court conducted a *de novo* review of the Magistrate Judge's recommendations and upheld the grant of summary judgment. This appeal followed.

### III

■ Before we can review the district court's decision on the merits, we must determine whether the court properly removed this action from state court. In *Yonkers Racing Corp. v. City of Yonkers,* 858 F.2d 855, 865 (2d Cir.1988), *cert. denied,* 489 U.S. 1077, 109 S.Ct. 1527, 103 L.Ed.2d 833 (1989), we laid out the standards for removal under the All Writs Act. We stated that a district court may remove a state court action where "removal was necessary to protect the integrity of the Consent Decree" and where "the issues raised by the [state court action] cannot be separated from the relief provided by the consent decree." *Id.* at 865.

The district court here found that allowing Maloney's action to proceed in state court would jeopardize the consent decree. We agree. A decision by a state court cancelling the contracts would jeopardize the ability of the City to comply with the timetables contained in the federal consent decree. The City would be forced, on an emergency basis, to seek alternative means of disposing of the enormous quantities of solid waste generated every day. It is rank speculation to suggest, as Maloney does, that the City could easily find alternatives and thus cease ocean dumping in time to comply with the demands of the consent decree.

In addition, the issues raised in Maloney's petition are inextricably linked with the relief ordered in the consent decree. The establishment of an interim land-based sludge management plan is one of the central goals of the consent decree. Maloney's petition raises issues relating to the validity of the plans chosen by the City, and thus cannot be separated from the consent decree. Accordingly, we hold that the district court properly enjoined the state proceeding and removed Maloney's petition to federal court.

### IV

■ Having decided that the district court properly exercised its power under the All Writs Act in removing the petition, we still must determine whether the action initiated by Maloney constitutes a "case or controversy." Although the parties have not raised the question, the existence of a real case or controversy is an irreducible minimum of the jurisdiction of the federal courts. *Valley Forge Christian College v.*

*Americans United for Separation of Church and State*, 454 U.S. 464, 471, 102 S.Ct. 752, 757–58, 70 L.Ed.2d 700 (1982). The parties may not waive the requirement. *Juidice v. Vail*, 430 U.S. 327, 331, 97 S.Ct. 1211, 1215, 51 L.Ed.2d 376 (1977). Nor can the All Writs Act confer on the courts the power to ignore the case or controversy requirement, which is rooted in Article III of the constitution's definition of judicial power. *Valley Forge*, 454 U.S. at 471–76, 102 S.Ct. at 757–61.

The precise contours of a "case or controversy" are not well defined. *See Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324–25, 82 L.Ed.2d 556 (1984). At the very least, there must be a party before the court with standing to sue. *ASARCO, Inc. v. Kadish*, 490 U.S. 605, 613, 109 S.Ct. 2037, 2043, 104 L.Ed.2d 696 (1989) (standing to sue is "one of the controlling elements in the definition of a case or controversy under Article III.") In order to have standing, the party seeking to invoke the power of the court must show (1) "that [s]he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant," *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99, 99 S.Ct. 1601, 1607–08, 60 L.Ed.2d 66 (1979); (2) that the injury "fairly can be traced to the challenged action," *Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 41, 96 S.Ct. 1917, 1926, 48 L.Ed.2d 450 (1976); and (3) that the injury "is likely to be redressed by a favorable decision." *Id.* at 38, 96 S.Ct. at 1924.

Here, petitioner Maloney asserts standing to protest the allegedly illegal contracts based on her status as a municipal taxpayer. At first blush, it might appear that Maloney's taxpayer status is insufficient to create standing. The speculative possibility that Maloney might have to pay higher taxes because the City spent too much on these waste disposal contracts does not seem like the "distinct and palpable injury" required by the standing doctrine. *Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975). Thus, if we were writing on a clean slate,

we might be inclined to find that Maloney lacks standing. In that event, we would have to consider whether the unquestioned stake of the defendants in the adjudication of this lawsuit is sufficient to create a "case or controversy." *See ASARCO*, 490 U.S. at 618, 109 S.Ct. at 2045 (where defendant is party who "seek[s] entry to the federal courts," if defendant has standing, then "dispute ... presents a justiciable case or controversy").

However, municipal taxpayer standing has ancient roots in our jurisprudence. *See Crampton v. Zabriskie*, 101 U.S. 601, 609, 25 L.Ed. 1070 (1880). In *Massachusetts v. Mellon*, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923) (popularly known as *Frothingham v. Mellon*) a case rejecting taxpayer standing for federal taxpayers, the Supreme Court gave a ringing endorsement to municipal taxpayer standing. The Court stated that "[t]he interest of a taxpayer of a municipality in the application of its moneys is direct and immediate and the remedy by injunction to prevent their misuse is not inappropriate. It is upheld by a large number of state cases and is the rule of this Court." *Id.* at 486, 43 S.Ct. at 601. The Court explained that the "relation of the corporate taxpayer to the [municipal] corporation ... is not without some resemblance to that subsisting between stockholder and private corporation." *Id.* at 487, 43 S.Ct. at 601. This close relationship contrasted with that of the taxpayer with the federal government, where any "interest in the moneys of the Treasury—partly realized from taxation and partly from other sources—is shared with millions of others; is comparatively minute and indeterminable; and the effect upon future taxation, of any payment out of the funds, so remote, fluctuating and uncertain, that no basis is afforded for an appeal to the preventive powers of a court of equity." *Id.*

In other words, under *Frothingham* we presume a municipal taxpayer's relationship to the municipality is "direct and immediate" such that the taxpayer suffers concrete injury whenever the "challenged activity involves a measurable appropriation or loss of revenue." *District of Co-*

*lumbia Common Cause v. District of Columbia,* 858 F.2d 1, 5 (D.C.Cir.1988). While this presumption may seem odd for municipalities with multi-billion dollar budgets, *see Council Approves $29.5 Billion Budget,* N.Y. Times, June 2, 1992, at B2, so long as *Frothingham* states the law of the land, we are bound by it.

Much has changed in federal standing jurisprudence since *Frothingham.* In *Flast v. Cohen,* 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968), the Supreme Court overruled *Frothingham's* blanket rejection of federal taxpayer standing and replaced it with a complex test requiring the taxpayer to show that the challenged action is an exercise of the taxing and spending powers and that the action violates "a specific constitutional limitation upon the exercise by Congress" of those powers. *Id.* 392 U.S. at 102–03, 88 S.Ct. at 1954. In *Doremus v. Board of Education,* 342 U.S. 429, 434, 72 S.Ct. 394, 397, 96 L.Ed. 475 (1952), the Court ruled that state taxpayers have standing only when bringing a "good-faith pocketbook action." However, we see nothing in either case to convince us that *Frothingham's* view of municipal taxpayer standing is not still good law.

Other courts of appeals to consider the question have uniformly concluded that municipal taxpayers have standing to challenge allegedly unlawful municipal expenditures. *See e.g., Cammack v. Waihee,* 932 F.2d 765, 769–72 (9th Cir.1991), *cert. denied,* — U.S. —, 112 S.Ct. 3027, 120 L.Ed.2d 898, 60 U.S.L.W. 3878 (June 29, 1992); *Freedom From Religion Foundation, Inc. v. Zielke,* 845 F.2d 1463, 1469–70 (7th Cir.1988) (stating the general rule but finding no standing since no municipal expenditures); *Hawley v. City of Cleveland,* 773 F.2d 736, 741–2 (6th Cir.1985), *cert. denied,* 475 U.S. 1047, 106 S.Ct. 1266, 89 L.Ed.2d 575 (1986); *District of Columbia Common Cause v. District of Columbia,* 858 F.2d 1, 3–8 (D.C.Cir.1988); *Donnelly v. Lynch,* 691 F.2d 1029, 1030–32 (1st Cir. 1982), *rev'd on other grounds,* 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984). *But cf. Rocks v. City of Philadelphia,* 868 F.2d 644, 648 (3rd Cir.1989) (concluding that municipal taxpayer met Article III ele-

ments of standing but dismissing case on prudential grounds). Two district judges in this circuit have also found municipal taxpayer standing. *Annunziato v. New Haven Bd. of Aldermen,* 555 F.Supp. 427, 430–31 (D.Conn.1982); *Ridgefield Women's Political Caucus v. Fossi,* 458 F.Supp. 117, 120 n. 3 (D.Conn.1978).

Finally, we note that a four justice plurality of the Supreme Court has recently, in *dicta,* indicated that municipal taxpayer standing should be limited to those instances where the taxpayer can establish "that the 'peculiar relation of the corporate taxpayer to the [municipal] corporation' makes the taxpayer's interest in the application of municipal revenues 'direct and immediate.' " *ASARCO,* 490 U.S. at 613, 109 S.Ct. at 2043 (opinion of Kennedy, J.) (quoting *Frothingham* ) (brackets in original). Thus, the plurality would replace the *Frothingham* presumption with a requirement that the municipal taxpayer establish a close connection to the municipal fisc. A majority of the Supreme Court has not yet done so. It is not our job to anticipate that the *ASARCO* plurality will garner a fifth vote. Accordingly, we join our sister circuits in finding that *Frothingham* still states the law on municipal taxpayer standing. Therefore, we conclude that Maloney has standing to challenge the City's expenditure of funds on these sludge removal contracts and that her petition constitutes a case or controversy for Article III purposes.

V

■ We turn now to considering whether the City lawfully let these contracts through requests for proposals, or whether G.M.L. § 103(1) required the City to proceed by competitive bidding. We conclude, for substantially the reasons stated in the magistrate's opinion, that these contracts for the implementation of a land-based sludge management plan fall within § 312(b)(1)(ii) of the new charter and therefore that competitive bidding was not required. We also agree with the magistrate's determination that G.M.L. § 103(1) does not preempt that section of the new

charter. Accordingly, we affirm the district court's grant of summary judgment.

Affirmed.