UNITED STATES of America,
Plaintiff–Appellee,

v.

AMERICAN SOCIETY OF COMPOS-
ERS, AUTHORS AND PUBLISH-
ERS, Defendant–Appellee,

In the Matter of the Application of Steve
KARMEN, Petitioner–Appellant.

Nos. 1206, 1412, Dockets 92–6184, 93–6284.

United States Court of Appeals,
Second Circuit.

Argued March 7, 1994.

Decided Aug. 22, 1994.

Charles M. Newman, New York City (Neal R. Platt, of counsel), for petitioner-appellant Steve Karmen.

Allan Blumstein, New York City (Jean H. McMahon, Paul, Weiss, Rifkind, Wharton & Garrison, I. Fred Koenigsberg, White & Case, Ross Charap, of counsel), for defendant-appellee American Soc. of Composers, Authors and Publishers.

Robert J. Wiggers, Dept. of Justice, Washington, DC (Anne K. Bingamen, Asst. Atty. Gen., Diane P. Wood, Deputy Asst. Atty. Gen., Robert B. Nicholson, Gregory B. Hovendon, Dept. of Justice, of counsel), for plaintiff-appellee U.S.

Before: CARDAMONE and MINER, Circuit Judges, and PARKER, District Judge.*

* Hon. Fred I. Parker, Chief Judge, United States District Court for the District of Vermont, sitting by designation.

728

CARDAMONE, Circuit Judge:

Jingles, as most everyone knows, are a constant sound presence on radio and television. Jingle writers who are members of the American Society of Composers, Authors and Publishers (ASCAP) have tried for over 15 years to convince ASCAP to give jingles greater royalty weight. Appellant Steve Karmen, a member of ASCAP, is a prolific writer of many enormously successful jingles, such as, "I Love New York," "Aren't You Glad You Use Dial," "Weekends Were Made For Michelob," "Nationwide Is On Your Side," and scores of others for leading advertisers such as Hertz, Budweiser, Ford, Pontiac, Hershey Chocolate, Midas Muffler, Liberty Mutual, Plymouth and Wrigley's Gum.

In 1981 as a result of Karmen's and other jingle writers' efforts, ASCAP raised the weight accorded jingles from one percent to three percent of a "use credit"—ASCAP's basic unit of distribution. Karmen, believing this increase insufficient, has sought in eight separate legal challenges over the past 12 years to gain greater weight for the use of jingles. He presently appeals from an order of the United States District Court for the Southern District of New York (Conner, J.) dated June 26, 1992 denying his motion to vacate or modify an arbitration award; and from an order of the same court dated September 7, 1993, denying his motion to vacate the June 26, 1992 order for lack of subject matter jurisdiction.

Appellant's complaint is that ASCAP is his fiduciary and is not paying him fairly from the moneys it receives for licensing his songs that were aired. Although he won at arbitration over this dispute, he says he is nonetheless in the position of having lost, because the arbitrators refused to set a new jingle weight, and a consent decree between ASCAP and the government makes arbitration his only remedy.

To aver, as petitioner does, that the consent decree between the government and ASCAP has left him in a legal limbo or set him on a road that leads nowhere has a plaintive but not persuasive sound. Although the arbitrators voided the three percent award for jingles—theoretically restoring the previous one percent rate—the Board of ASCAP in 1991 restored the three percent rate, and by reducing the weight of commercials, increased the number of credits for jingles by 16 percent, placing Karmen in a better position than he was in prior to arbitration. His continuing actions suggest some chagrin at the lack of results, capsulized in the title of Henry Blossom's old song: "I Want What I Want When I Want It."

## BACKGROUND

ASCAP, founded in 1914, is an unincorporated membership association, comprising 55,000 writers and publishers. The members grant the association a nonexclusive right to license for public use nondramatic performances of their works. ASCAP takes in substantial revenues from these use licenses. The revenues, less deductions for operating expenses, are distributed to the members. The percentage of profits that each member receives depends upon the type of use to which that member's composition is put— whether the work is performed as a theme, background music, a jingle, cue music, bridge music, or used in a feature performance. The system of classification and distribution is detailed in ASCAP's Articles of Association.

### A. The 1941 Antitrust Litigation

There are two major organizations of music copyright holders, ASCAP, with three million songs in its repertory, and the smaller Broadcast Music, Inc. (BMI), founded in 1939, with one million songs. See ASCAP v. Showtime/The Movie Channel, Inc., 912 F.2d 563, 565 (2d Cir.1990). In 1941 the government sued ASCAP under the Sherman Act, 15 U.S.C. § 1, alleging antitrust violations in its dealings with persons seeking licenses and in its dealings with its members. One goal of the government was to insure that the distribution of revenue to ASCAP members be made on a "fair and non-discriminatory" basis. See Sam Fox Publishing Co. v. United States, 366 U.S. 683, 686, 81 S.Ct. 1309, 1311, 6 L.Ed.2d 604 (1961).

Later that same year ASCAP and the government entered a consent decree. The

decree includes a requirement that revenues be distributed on an equitable basis. ASCAP's by-laws, the consent decree continues, shall provide that money received for public performance for profit of the members' copyrighted musical compositions shall not be distributed on any basis other than "the number, nature, character and prestige" of the members' compositions, how long the works have been part of the Society's catalog, "and popularity and vogue of such works, all to be determined in a fair and non-discriminatory manner." *United States v. ASCAP,* 1940–1943 Trade Cas. (CCH) ¶ 56,104 at 405 (S.D.N.Y.1941).

In 1950 the consent decree was superseded by an Amended Final Judgment (consent judgment), which ordered that ASCAP's distribution to members be made "on a basis which gives primary consideration to the performance of the compositions of the members as indicated by objective surveys of performances (excluding those licensed by the members directly) periodically made by or for ASCAP." *United States v. ASCAP,* 1950–1951 Trade Cas. (CCH) ¶ 62,595 at 63,-755 (S.D.N.Y.1950). The consent judgment was modified again ten years later by a consent Order entered by the same court in 1960 (the 1960 Order). *See United States v. ASCAP,* 1960 Trade Cas. (CCH) ¶ 69,612 (S.D.N.Y.1960).

The 1960 Order specified how the performance surveys were to be conducted. Revenue distribution to ASCAP members was to be made on the basis of an objective scientific survey, replacing a somewhat arbitrary survey that gave undue emphasis to network broadcasting performances. The new survey increased radio, nightclub, and dance hall sampling. The 1960 Order also established a new system of "Weighting Rules" to determine the value of the various uses of the music licensed by ASCAP, and put into effect an initial "Weighting Formula" to be used by ASCAP when determining the amount of distribution to be made to each member.

When an ASCAP composition is performed and picked up on the survey it is given a value under the Weighting Rules. The basic unit for distribution purposes is a "use credit." By increasing his or her number of use credits, a member's revenue is increased. *Id.* at 76,467. Pursuant to the 1960 Order, ASCAP must seek court approval before amending the Weighting Rules, and must give the government 30 days notice before amending the Weighting Formula. The 1960 Order also required ASCAP to establish a review board and an arbitration mechanism to resolve members' complaints regarding the distribution of revenues. *Id.* at 76,472. The initial formula allocated one percent of one use credit to jingle writers for each broadcast.

In its Membership Agreement and Articles of Association, ASCAP incorporated much of the language from the consent judgment and the 1960 Order. For example, Article 14, § 6A adopts the language of the consent judgment in providing that in determining each member's share of royalties, the Classification Committee must "take into consideration the number, nature, character and prestige of works composed, written or published by such member, the length of time in which the works of the member have been a part of the catalogue of the Society, and popularity and vogue of such works, all to be determined in a fair and non-discriminatory manner.... Primary consideration shall be given to the performance of the compositions of members as indicated by objective surveys of performances ... periodically made by or for the Society." Section 6B of Article 14 sets forth a procedure for resolution of disputes over distributions in the same language as the 1960 Order, requiring the aggrieved member to protest to a Board of Review, with a right to appeal to a panel of the American Arbitrators Association (AAA).

#### B. *The Present Dispute*

As a jingle writer, Karmen joined ASCAP in 1972, giving it a nonexclusive right to license the broadcast of his jingles. By doing so, Karmen agreed to the terms of its Articles of Association and Membership Agreement, including the provision that requires him to arbitrate any disputes concerning royalty distributions. When he joined ASCAP the initial jingle weight of one percent remained in effect. Karmen and other jingle writers began lobbying in 1977 for a

greater weight for jingles. In 1981 ASCAP's Board of Directors increased the value to three percent. We note that the government has filed a brief on this appeal telling us that when ASCAP's Board of Directors raised the jingle rate to three percent it did not object because it considered the matter one within the exercise of that body's reasonable business judgment.

Because Karmen believed this increase insufficient, he filed a complaint with the Board of Review in accordance with the dispute resolution procedure in the Articles of Association. In a 26–page decision, the Board denied his request to replace the three percent rule with one giving a greater weight for jingles. Karmen exercised his right to appeal this decision to an AAA panel, which affirmed the decision of the Board of Review.

Karmen then petitioned the Southern District of New York to vacate the decision of the arbitration panel on the grounds that he had been denied due process and that the panel's refusal to conduct a trial de novo constituted misconduct. Judge Conner rejected Karmen's due process claim, but remanded the matter to the arbitration panel for further consideration because there was no indication that the arbitration panel knew it could hear improperly excluded evidence or re-evaluate the Board's factfinding by conducting a limited trial de novo. See United States v. ASCAP (Karmen I), 708 F.Supp. 95 (S.D.N.Y.1989). On remand in April 1991, an arbitration panel with the same members as those that comprised the original panel ruled that the decision of the Board of Directors to increase the weight given to jingle performances from one to three percent was arbitrary. It therefore declared that rule void, stating that its decision was in full settlement of all claims submitted to it.

Karmen again petitioned the Southern District asking it to vacate or modify the panel decision, this time on the grounds that the arbiters' decision deprived him of a final and definite award in violation of Article 75 of the New York Civil Practice Law and Rules, CPLR § 7511(b)(1)(iii) (McKinney 1980), and section ten of the Federal Arbitration Act, 9 U.S.C. § 10(a)(4) (Supp. IV 1993). Petitioner insisted the arbitration panel should either

have set a new rate for jingles or established guidelines for the ASCAP Board to follow when it established a new weight, and that absent either of these actions the panel award was not final. The district court rejected these alternative requests for relief, stating that the panel's decision was final, that it had exhausted its authority, and that Karmen lacked standing to seek a determination of the appropriate rate because he was not a party to the consent judgment entered into between ASCAP and the government. See United States v. ASCAP, 1992–2 Trade Cas. (CCH) ¶ 69,897, 1992 WL 167383 (S.D.N.Y.1992).

Appellant returned to the district court once again in October 1992 contending the district court lacked subject matter jurisdiction over the motion that he himself had brought before it. He asked the district court to vacate its June 26, 1992 order. Judge Conner was not persuaded. He reasoned that Karmen's motion to vacate or modify the arbitration panel's decision, although founded upon his contract with ASCAP under the Articles of Association and Membership Agreement, necessarily would require construction and enforcement of the terms of the consent judgment, and that the motion therefore came under the district court's continuing jurisdiction over implementation of that 1950 judgment, as modified by the 1960 Order. See United States v. ASCAP (Karmen II), 832 F.Supp. 82 (S.D.N.Y.1993). Karmen appeals this determination, as well as the district court's decision on the merits of his motion to vacate or modify the panel's award. We affirm.

## DISCUSSION

### I   Subject Matter Jurisdiction

■   As an initial matter we address Karmen's assertion that the district court lacked subject matter jurisdiction over his motion to vacate or modify the arbitration panel's award. Absent the consent judgment, we would agree with Karmen that his motion would not lie in federal court. He sought relief under a state statute—CPLR Art. 75— and a federal statute—the Federal Arbitration Act. State law obviously provides no

basis for federal court jurisdiction, and although the Federal Arbitration Act states that federal courts may entertain applications seeking to vacate arbitration awards, *see* 9 U.S.C. § 10, it does not confer subject matter jurisdiction on a district court, *see Harry Hoffman Printing, Inc. v. Graphic Communications, Int'l Union, Local 261*, 912 F.2d 608, 611 (2d Cir.1990). Further, there is no diversity between the parties—ASCAP and Karmen are both domiciled in New York—and the motion to vacate or modify the arbitration award does not present a question arising under the Constitution, laws or treaties of the United States.

Nonetheless, we do not agree with appellant that there is no source of federal jurisdiction. In fact, that source was asserted by Karmen himself in his motion papers before the district court, namely the district court's "continuing jurisdiction over the ASCAP Consent Judgment." Section XVII of the consent judgment provides

> Jurisdiction of this cause is retained for the purpose of enabling any of the parties to this Amended Final Judgment to make application to the Court for such further orders and directions as may be necessary or appropriate in relation to the construction of or carrying out of this Judgment, for the modification thereof, for the enforcement of compliance therewith and for the punishment of violations thereof.

*United States v. ASCAP*, 1950–1951 Trade Cas. (CCH) ¶ 62,595, at 83,756.

As we determined over 20 years ago, a federal district court has exclusive jurisdiction over actions that, if left to the state courts to decide, would frustrate the federal court's continuing jurisdiction over and implementation of the consent judgment between ASCAP and the government. *See United States v. ASCAP (Zekley)*, 442 F.2d 601, 603 (2d Cir.1971). In that case, ASCAP received retroactive payments for the use of works licensed by ASCAP during the period from 1962 until 1969. ASCAP decided to include the funds in the regular distribution for 1970, and the district court approved that method. *See id.* at 602–03. Two ASCAP members sought an injunction in California state court to prevent ASCAP's proposed

distribution, contending that the funds should be dispensed only to the members whose works were performed in 1962 to 1969. *See id.* at 603. We affirmed the district court's enjoining of the members from continuing their action in state court, reasoning that several state court decisions about the proper method of distribution would frustrate the consent judgment. *See id.*

Further, we held the district court retained exclusive jurisdiction over suits related to the consent judgment, and that its action was a proper exercise of its authority to stay state court proceedings when "necessary in aid of its jurisdiction, or to protect or effectuate its judgments." *Id.* (quoting 28 U.S.C. § 2283); *see also United States v. City of New York*, 972 F.2d 464, 469 (2d Cir.1992) (affirming removal of state law actions to federal court under All Writs Act, 28 U.S.C. § 1651, where issues raised in state court could not be separated from the relief ordered in a consent decree); *United States v. International Bhd. of Teamsters*, 907 F.2d 277, 280–81 (2d Cir.1990) (affirming injunction barring collateral lawsuits by non-parties to consent decree in any other forum where such actions posed significant risk of subjecting consent decree to inconsistent interpretations); *Yonkers Racing Corp. v. City of Yonkers*, 858 F.2d 855, 864 (2d Cir.1988) (affirming removal of non-parties' state law actions to federal court where those actions might have frustrated implementation of a consent decree), *cert. denied*, 489 U.S. 1077, 109 S.Ct. 1527, 103 L.Ed.2d 833 (1989); *In re Baldwin–United Corp.*, 770 F.2d 328, 336–37 (2d Cir.1985) (affirming use of All Writs Act to enjoin non-parties from commencing actions in state court where such proceedings would frustrate district court's efforts in case before it). We see no principled reason why the result should be different when the state law action, as here, is brought before the district court in the first instance.

The pertinent issue is whether Karmen's motion to vacate the arbitration award, if resolved in New York state court, would pose a significant risk of frustrating the district court's jurisdiction over the consent judgment. Had Karmen brought his motion to vacate or modify the arbitration award in

New York state court, that tribunal would have needed to determine whether the arbitration panel "exceeded [its] power or so imperfectly executed it that a final and definite award upon the subject matter submitted was not made." CPLR § 7511(b)(1)(iii). This determination would depend upon the scope of the panel's authority as provided for in Article 14, section 6B of ASCAP's Articles of Association. That provision came about as a result of the 1960 Order, which dictated the authority of the arbitration panel and the nature of the relief permitted. In fact, the specific language used in the Articles to define the arbitration panel's authority is the same as that used in the 1960 Order. For these reasons, we agree with the district court that Karmen's petition does not simply raise contract questions under New York law, but rather asks a state court "to construe and enforce the terms of the Consent Decree as amended by [the] 1960 Order." 832 F.Supp. at 86. Because such potential action by a state court poses a significant risk of frustrating the district court's exclusive jurisdiction over the 1950 consent judgment, Karmen's motion comes within the federal court's subject matter jurisdiction.

## II Merits

■ We turn now to appellant's substantive argument that the arbitration panel's award was not final. Under Article 75 of the CPLR, as already stated, an arbitration award will be vacated if the arbitrators acted in excess of their power or used it so as to prevent a final award on a matter before them. *See* CPLR § 7511(b)(1)(iii). Similarly, the Federal Arbitration Act provides that a district court may vacate an arbitration award "[w]here the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." 9 U.S.C. § 10(a)(4). Karmen maintains the panel imperfectly executed its authority in failing to set a new rate for jingles or to provide guidelines to ASCAP's Board of Directors for determining a new rate; hence, he posits, without citation of any authority for the proposition, that the award rendered was not final and definite.

■ Because the scope of the arbitrators' authority is defined by the terms of the arbitration agreement, *see* CPLR § 7511(b)(1)(iii), cmt. C7511:5, we look to the language of the arbitration clause in AS-CAP's Articles of Association. In accordance with the 1960 Order, that clause states

> Any member, aggrieved by the distribution of the Society's revenues to such member, or by any rule or regulation of the Society directly affecting the distribution of the Society's revenues to such member, may ... protest to the Board of Review....
>
> ....
>
> The decision of the Board of Review shall be deemed final unless either the member or the Classification Committee files a notice of appeal in writing ...; in such case all evidence taken before the Board of Review shall be referred to the [AAA] Panel....
>
> The Panel, after considering any such appeal, may reverse or modify the decision of the Board of Review by a vote of not less than two-thirds of the Panel and in its discretion may impose costs....
>
> On appeal to the Panel from an adverse decision of the Board of Review, the appellant may seek to have the order, rule or regulation involved properly interpreted or applied, to have errors rectified, or to void such rule or regulation on grounds of its discriminatory or arbitrary character.

Articles of Association, Art. XIV, § 6B.

Karmen believes that the quoted language authorized the arbiters to set a new rate for jingles consistent with the other provisions of the Articles of Association. He relies specifically on the word "modify" in contending the panel should have set a new rate. But a plain reading of the language makes clear that an arbitration panel may only modify "the *decision* of the Board of Review;" and, in that respect, "modify" means may make only a minor or moderate change. *See* Webster's Third New International Dictionary 1452 (1976). But nothing in the Articles of Association gives an arbitration panel authority to modify any rule or regulation of AS-CAP. If a rule is found by an arbitration panel to be arbitrary, it may declare such

rule void, at which point its authority is ended. That is precisely what the panel did in this case. Thus, the panel's authority was exhausted after it declared the three percent rule void.

Moreover, the panel's decision was final. The matter submitted was whether the increase in the jingle rate from one to three percent was discriminatory or arbitrary. Having found the decision arbitrary, the panel properly exercised its authority to declare the three percent rule void and unequivocally stated, "This Determination is in full settlement of all claims submitted to this Arbitration." As a consequence, there is no merit in Karmen's bald assertion that the panel's determination was not final.

### III    Authority of the District Court

■ There remains appellant's argument that the district court itself should have determined a new, higher jingle rate. Although that court's continuing jurisdiction over the consent judgment brought Karmen's state law motion within its jurisdiction, such did not thereby convert his petition into one to enforce the consent judgment. Karmen's motion under Article 75 of the New York CPLR is all that was properly before the district court, and it could only provide the relief available under the statute—vacatur of non-final arbitration awards. Having found that the arbitration panel's decision was final, the district court had fully exercised its jurisdiction.

Karmen as a non-party to the consent judgment lacks standing to petition the district court to enforce that judgment. *See Sam Fox Publishing Co.,* 366 U.S. at 689, 81 S.Ct. at 1312; *Ambook Enters. v. Time Inc.,* 612 F.2d 604, 612 n. 14 (2d Cir.1979), *cert. dismissed,* 448 U.S. 914, 101 S.Ct. 35, 65 L.Ed.2d 1179 (1980); *United States v. AS-CAP (Metromedia),* 341 F.2d 1003, 1007 (2d Cir.), *cert. denied,* 382 U.S. 877, 86 S.Ct. 160, 15 L.Ed.2d 119 (1965). As a private party, any antitrust claim he might have against ASCAP would have to be brought in a private action. *See Sam Fox Publishing Co.,* 366 U.S. at 689, 81 S.Ct. at 1312. Contrary to the position he takes on this appeal, standing is not conferred on appellant to enforce

the consent judgment simply because his state law action comes within the district court's jurisdiction over that judgment.

Finally, petitioner thinks that an *ad hoc* arbitration panel or various state courts can review the distribution of royalty payments by ASCAP and if found to be unfair—change them. Such is not so. It must be kept in mind the extraordinary complex formula that regulates royalty distributions, one designed to ensure that such distribution is fair, deals with a finite reservoir of royalties. When more is taken out for one classification of composers, less remains in the reservoir for others, that is, if the jingle writers get more royalties, other composers' incomes are necessarily decreased. It is for that reason that all the 55,000 members of ASCAP are entitled to rely on a scheme that ensures changes to the weights accorded their compositions will be made by the Board of Directors of ASCAP, with the government monitoring their actions, subject to review in the federal courts.

### CONCLUSION

For the reasons stated the orders of the district court are accordingly affirmed.