**UNITED STATES of America,
Plaintiff,**

v.

**AMERICAN SOCIETY OF COMPOS-
ERS, AUTHORS AND PUBLISH-
ERS, et al., Defendants.**

**In the Matter of the Protest of
Richard Lewis Warren.**

**No. CIV. A. 41–1395 (WCC).**

United States District Court,
S.D. New York.

Jan. 31, 2001.

As Amended Nunc Pro Tunc
March 14, 2001.

**328**

American Society of Composers, Authors and Publishers, New York, NY, Richard H. Reimer, of Counsel, Darby & Darby PC, New York, NY, Ross Charap, of Counsel, for Defendant American Society of Composers, Authors and Publishers.

Richard Lewis Warren, Calabasas, CA, Writer Member Pro Se.

### OPINION AND ORDER

WILLIAM C. CONNER, Senior District Judge.

In 1941, the Government's civil action against the American Society of Composers, Authors and Publishers ("ASCAP" or the "Society") for alleged violations of the Sherman Antitrust Act, was settled by the entry of a consent decree (the "1941 Consent Decree"). *See United States v. AS-CAP*, 1941 Tr. Cas. (CCH) ¶ 56,104 (S.D.N.Y.1941). The 1941 Consent Decree was amended on March 14, 1950 (the Amended Final Judgment or "AFJ"), and again on January 7, 1960 (the "1960 Order"). The terms of these orders continue to regulate the manner in which ASCAP participates within the music industry. This Court has exclusive jurisdiction under Section XVII of the AFJ to oversee the implementation of these provisions. The membership agreements signed by the members of ASCAP, specify that they are subject to the provisions of ASCAP's Articles of Association, the AFJ and the 1960 Order. (Meltzer–Zahn Aff. ¶ 8, Ex. A.)

ASCAP member Richard Lewis Warren filed a Protest in January 1998 before the Board of Review (the "Board") pursuant to the internal grievance procedures set forth in the Articles of Association and the 1960 Order. Although Warren filed an appeal to the American ·Arbitration Association ("AAA") after the Board rendered its decision on October 18, 1999, he has failed to pursue this administrative remedy. He claims that he has been denied access to financial documents to which he is entitled under the 1960 Order and questions the structure of the AAA and the impartiality of its members. Further, he argues that the Protest was void as ASCAP's attorneys should have recused themselves because of a conflict of interest. Instead, Warren has filed a fourth state court action against ASCAP in California seeking substantially the same relief he requested in the Protest.

In ·connection therewith, ASCAP now moves this Court to: (1) limit the extent by which ASCAP must consolidate Warren's financial documents pursuant to Section V(C) of the 1960 Order; (2) declare that Warren has failed to demonstrate "good cause," as required under Section V(C) of the 1960 Order, in his demand to receive other ASCAP members' financial and distribution records; (3) require War-

ren to provide ASCAP with written assurance that he will not misuse the membership list before he is allowed access to it pursuant Section V(B) of the 1960 Order; (4) declare that ASCAP's counsel was not subject to a conflict of interest when representing ASCAP on Warren's Protest or the upcoming appeal to the AAA; (5) enjoin Warren from bringing any further state court actions that involve the interpretation, enforcement or modification of the AFJ; and (6) order that Warren must exhaust his administrative remedies as required under Section V(D) of the 1960 Order and the Articles of Association by appealing to the AAA if he desires to pursue his grievance. For the reasons stated hereinafter, ASCAP's motion is granted.

## BACKGROUND

### A. *Protest*

Warren, a writer of musical scores for television, previously a member of Broadcast Music, Inc. ("BMI"), became a member of ASCAP in 1983. (Meltzer–Zahn Aff. ¶ 9, Ex. A.) For over ten years, the parties have constantly argued over whether: (1) ASCAP failed to pay Warren for performances of works he claimed were transferred from the BMI repertory to the ASCAP repertory; (2) ASCAP failed to credit as feature performances approximately 234 musical cues he composed for two television series that aired in the mid–1980's, *Dallas* and *Remington Steel;* (3) Warren received adequate distributions of royalties for foreign performances of the same cues; (4) ASCAP's in-house and outside counsel, their staff, associates, consultants, friends, or partners should have recused themselves from representing ASCAP in Warren's Protest, events leading up thereto or the upcoming appeal to the AAA based upon a "conflict of interest;" and (5) Warren should be allowed unlimited access to ASCAP's membership list pursuant to Section V(B) of the 1960 Order and/or other members'

financial records pursuant to Section V(C) of the 1960 Order.

Ultimately, in January 1998, Warren filed a Protest before the Board in accordance with Section V(D) of the 1960 Order and Article XIV, Section 4 of the Articles of Association, in order to determine whether ASCAP owed him certain royalties. (Meltzer–Zahn Aff. ¶ 12.) On August 3, 1999, the Board conducted a hearing in which all of the above-mentioned issues were raised. (*Id.* ¶ 13, Ex. C; ASCAP Mem. Supp. Mot. at 6–7.) On October 18, 1999, the Board, in an unanimous nineteen-page decision, held that: ASCAP owed no additional distributions to Warren for any works that he claimed may have been transferred from the BMI repertory; Warren did not establish that ASCAP had withheld money from him based upon foreign performances; Warren did not establish that he was underpaid by ASCAP for the feature performances at issue, but was in fact overpaid for such performances; and that ASCAP had provided Warren with all relevant documents prior to the date of the Protest and, because Warren had not established "good cause" pursuant to the 1960 Order, he was not entitled to any further records. (Meltzer–Zahn Aff., Ex. D.) Because the Board does not have the power to determine questions of law, it did not render a decision as to whether ASCAP's attorneys were subject to a conflict of interest and should have recused themselves. (*Id.*)

On October 19, 1999, Warren filed an appeal from the decision of the Board. On October 29, 1999, the matter was referred to the AAA in New York in accordance with the Articles of Association. On February 23, 2000, the AAA appointed an impartial three-member panel: The Honorable Marvin E. Frankel, former United States District Judge for the Southern District of New York; The Honorable Frederick B. Lacey, former United States District Judge for the District of New Jersey; and William L.D. Barrett, a New York City attorney. However, Warren

has not proceeded with the appeal because of his claim of conflict of interest as well as his claim that he was denied the right to inspect ASCAP and other members' financial documents and the membership list. He has also asserted that New York was not the proper forum for the appeal, and that it should be conducted in California.

### 1. *Production of Documents*

For many years, Warren has strived to prove that ASCAP has cheated him out of royalties. In response to Warren's demands for the production of documents, ASCAP has supplied him with: (1) Warren's foreign and domestic distribution statements from 1984 to the time in question; (2) all documents within his file with the exception of those subject to an attorney-client privilege for communications between ASCAP and its attorneys; (3) copies of all available canceled checks paid to Warren and his former wife; (4) ASCAP's financial statements made available to members during the period in question; (5) copies of various iterations of the Weighting Formula and other internal documents which indicate the weights accorded various types of performances during the period at issue; (6) copies of original cue sheets and ASCAP's electronic cue sheets for the TV programs subject to the Protest; and (7) computer generated summaries of his "pay" file for the preceding five fiscal years showing the performances of compositions for which he was paid during the period, the type of performance, the number of credits, the royalties received for such performances and a list of writer credit values on a quarterly basis. (Meltzer–Zahn Aff., Ex. E.)

ASCAP, however, has refused to disclose several sets of documents: (1) any publisher distribution statements or publisher correspondence information, based upon the fact that they were confidential in nature and contained wholly irrelevant information; but ASCAP did advise Warren to contact the publisher concerning these items; (2) members' performance records,

on the asserted ground that Warren did not demonstrate "good cause" as required by the 1960 Order; (3) ASCAP's own financial documents; and (4) the membership list which includes members' names and addresses. (*Id.*)

In connection with his own financial documents, Warren sought the production of cue sheets for 30 television shows. (Meltzer–Zahn Aff. ¶ 17 n. 2, Ex. E.) ASCAP did not comply with this request. On November 2, 1999, after the Board rendered its decision, Warren also sought all financial documents that would demonstrate that he did in fact receive feature credit for 51 cues that were deemed by the Board to be feature performances. (Meltzer–Zahn Aff. ¶ 17, Ex. E.) ASCAP complied with this request with respect to five cues, but refused to comply with the remaining request because of its impracticality. (*Id.*, Ex. F.) However, ASCAP has offered Warren the opportunity to inspect his financial records in the New York City office. (*Id.*, Ex. E.) To date, this offer remains unaccepted.

### 2. *Conflict of Interest*

Warren has also made several demands that "ASCAP's counsel, in-house and outside counsel, their staff, associates, consultants, friends, or partners" recuse themselves from the proceedings because of a claimed conflict of interest. (Reimer Aff. ¶ 2, Ex. D.) Warren alleged that ASCAP's counsel purportedly represents the members and therefore, could not represent ASCAP against him in grievance proceedings. (*Id.*) ASCAP's attorneys did not recuse themselves and represented ASCAP in the Protest.

### B. *Lawsuits Filed*

Warren has filed a series of suits against ASCAP in California. On April 6, 1998, Warren filed suit against ASCAP in California Superior Court alleging breach of contract resulting from ASCAP's failure to pay proper royalties. ASCAP moved for summary judgment on the ground of lack

of subject matter jurisdiction based upon this Court's exclusive jurisdiction over the proceedings and the case was ultimately dismissed on December 11, 1998 due to Warren's failure to appear at a show cause hearing. (Meltzer–Zahn Aff. ¶ 23 n. 1.)

Although, on October 19, 1999, Warren filed an appeal from the decision of the Board, he has failed to go forward with the appeal. Instead, on February 17, 2000, Warren commenced another action in the Superior Court, County of Los Angeles, seeking the production of the same documents pursuant to CAL. CIVIL PROC. § 2035(a)-(b) by claiming that such documents may be destroyed by ASCAP. He further requested the imposition of sanctions against ASCAP for failure to comply with discovery pursuant to CAL. CIVIL PROC. § 2023(a)-(b). (Reimer Aff., Ex. A.) Judge Anthony J. Mohr denied the petition on March 30, 2000, stating that there was no indication that the documents Warren sought would be destroyed by AS-CAP. He also referred to this Court's jurisdiction and stated that it would be the best court in which to hear the claims. Warren's motion for rehearing was denied on May 24, 2000. (Meltzer–Zahn Aff. ¶ 24; Reimer Aff. ¶ 2, Ex. A.)

On March 29, 2000, Warren filed an action for declaratory judgment in the United States District Court for the Central District of California that: (1) plaintiff is not required to appeal his protest to the AAA, but that in the event that he is required to do so, the AAA proceeding must be held in California; (2) ASCAP must supply its membership list and all financial documents in connection with plaintiff and other members; (3) ASCAP counsel must be recused from further participation; and (4) California law should control. (Meltzer–Zahn Aff. ¶ 25; Reimer Aff. ¶ 2, Ex. B.) On May 10, 2000, United States District Judge J. Spencer Letts granted ASCAP's motion to dismiss. (Meltzer–Zahn Aff. ¶ 25; Reimer Aff. ¶ 2, Ex. B.)

On May 24, 2000, Warren filed his third state court action against ASCAP in the Superior Court, County of Los Angeles, alleging unfair and deceptive business practices and false and misleading advertising because of ASCAP's failure to provide him with the requested financial documents and the membership list. (Reimer Aff. ¶ 2, Ex. C.) On August 28, 2000, Judge Mohr sustained ASCAP's demurrer and dismissed the complaint as well as denying Warren's motion to disqualify Richard Reimer, one of ASCAP's attorneys, from appearing pro hac vice. (Reimer Reply Aff. ¶ 2, Exs. A, B.)

Finally, on October 31, 2000, while the instant motion was pending before this Court, Warren filed yet another action in the Superior Court, County of Los Angeles, alleging, inter alia, breach of contract, fiduciary duties, conversion, and good faith and fair dealing. On November 30, 2000, the case was removed to the United States District Court for the for the Central District of California. On January 3, 2001, Warren filed a motion to remand to state court. On January 25, 2001, Warren's motion was granted.

## DISCUSSION

### I. Disclosure of Documents

#### B. Financial Records

Section V(C) of the 1960 Order states:

ASCAP shall within nine months after the end of each fiscal survey year prepare alphabetical lists of all compositions which received performance credits during said year, showing the number of credits received by each composition. In addition, ASCAP shall maintain records showing, for each composition which received performance credits as a theme or as background, cue or bridge music during said fiscal survey year, the number of feature performance credits received by said composition during the preceding five fiscal survey years. Any member or his authorized agent may inspect such lists and records with re-

spect to his own compositions, and other portions of such lists and records shall be available for further inspection by any member or his authorized agent to the extent that such inspection is sought in good faith in connection with any financial interest of such member as a member. All other records of the Society relating to the distribution by AS-CAP to its members shall be open for inspection by any member or his authorized agent, for good cause, provided that such member shall have been a member of ASCAP for at least one year prior to his request for such inspection.

### 1. *Warren's Own Records*

As stated above, ASCAP has supplied Warren with numerous documents in response to his demands and has notified Warren that all of his financial records may be made available for his inspection at its New York Office. However, it has not been able to comply with several of Warren's demands because the data he seeks are not consolidated on any existing record, but must be compiled by ASCAP employees. At this time, ASCAP petitions this Court to declare that under Section V(C) of the 1960 Order, its only duty is to provide the documents for inspection and not engage in any tasks that would be considered too onerous on its employees.

Warren initially requested the copies of cue sheets for 30 television series. Because cue sheets, stored on microfilm, range in length from 1 to 10 pages, Warren's request would require ASCAP employees to locate and print copies of 2,140 separate pages. (Meltzer–Zahn Aff. ¶ 17 n. 2.) ASCAP estimates that it would take its staff approximately 30 to 40 hours to complete this task. (*Id.*) As a result, this request was not complied with.

Recently, Warren has requested information that would allow him to determine if in fact he had received the correct amount of royalties for 51 cues classified as "feature performances." ASCAP begs this Court not to require its employees to engage in such an impractical task. As ASCAP explains, individual performances, or cues, are not separately listed on the members' performance statements. Cues are consolidated by identical parties in interest with identical shares into a single title record. (*Id.* ¶ 17.) Therefore, it is difficult to discern from the records whether feature performance credit has been awarded for certain cues.

ASCAP completed the requested endeavor with respect to five cues. The exhibit demonstrates that it is possible for ASCAP to verify whether Warren had received feature and/or background performance for certain cues. However, the three-page exhibit took eight hours to compile. At this rate, this Court estimates that similar exhibits for the other 46 cues would require another 74 hours of staff time.

■ Under Section V(C) of the 1960 Order, Warren has an unlimited right to inspect his own financial documents. AS-CAP has assured him that right, and this Court will enforce that commitment. Warren and/or his authorized representative may inspect those documents in the New York City office at any time during normal office hours and make whatever copies and compilations plaintiff desires. However, this Court will not require ASCAP employees to engage in tasks that would take weeks of time at the request of only one of several hundred thousand ASCAP members. Therefore, the relief requested by ASCAP in this respect is granted.

### 2. *Financial Records of ASCAP and Other ASCAP Members*

■ Warren has sought access to inspect and copy all of ASCAP's financial records as well as every other ASCAP members' financial documents. Under Section V(C), in order to view other members records, "good cause" must be demonstrated. The Board unanimously concluded that Warren failed to demonstrate the requisite "good cause for, or any rele-

vance to his Protest of, ASCAP's records of credits earned by other compositions in the ASCAP repertory or payments to other ASCAP members." (Meltzer–Zahn Aff. ¶ 15, Ex. D.) We agree. Warren has been provided copies of or access to enough documents to establish his claim.

ASCAP argues that Warren has never, in "the literally hundreds of pages of correspondence" sent by him, articulated the requisite good cause. (ASCAP Mem. Supp. Mot. at 15.) In direct opposition, Warren claims that he has good cause for inspecting all other members' financial documents based upon the fact that AS-CAP has repeatedly changed the description of performances from feature to background, without informing its members, essentially cheating them out of "tens of millions of dollars collectively." (Warren Affm. Opp. Mot. at 8.)[1] In support of his position, Warren submits a letter written by Ross Charap, Vice President of Legal Affairs, which states that this procedure occurs thousands of times a year. (Warren Affm. Opp. Mot. at 8–12; Warren's Evid. Supp. Affm. Opp. Mot., Ex. 2.)

ASCAP readily admits that in various circumstances, it will review the videotapes of performances and change the information contained within the cue sheet and the data base that contains "summarized" information. (Meltzer–Zahn Aff. ¶ 4.) After the information has been transferred from the cue sheet to the data base, ASCAP staff will input any omissions later discovered. (Id. ¶ 5.) Each quarter, ASCAP also randomly selects a week of television network programming and compares the vid-

eotapes to the information contained within in the cue sheets and data base. During this "week of accuracy," if the appointed "special listener"[2] determines that there are any discrepancies between the videotapes and the cue sheet/data base information, such discrepancies will be changed. (Id. ¶ 6.) Finally, when members asks AS-CAP to review its records in connection with proper payment of royalties, any errors will be corrected. (Id. ¶ 7.)

Warren argues that because it takes nine months to be paid, "[w]ithout such access to the workings of ASCAP no member will ever be able to determine where, in what matter and to what extent they are being cheated." (Warren Affm. Opp. Mot. at 34.) He claims it is his "right under the Consent Decree as it now stands and during the time of my protest, to find out just how pervasive ASCAP's illicit and inappropriate conduct in this and other matters." (Id. at 36.) Warren claims that it is essential to compare his works to composers of similar works who may have been given preferential treatment. Warren further alleges that ASCAP also alters cue sheets that are sent out to the performing rights organizations ("PROs") so that they differ from those used at home. He states that in 1999, he received merely $51 from distributions from England at a time when England's PRO paid to ASCAP over $3,000 for one series written by Warren.

Warren further argues that it is his right as a member to inspect ASCAP's financial records to examine the special funds ASCAP has established to support lobbyists and special causes.[3] Warren re-

---

1. Warren's Affirmation in Opposition to AS-CAP's motion as well as the evidence submitted in support of his position were unsigned. Although this Court could exercise its discretion and disregard all of Warren's papers, it has declined to do so. Even after consideration of Warren's papers, the Court finds AS-CAP is entitled to the requested relief. Therefore, there is no prejudice towards ASCAP.

2. A special listener is someone who holds a music degree and is familiar with the cue

sheet preparation process and ASCAP's distribution rules.

3. Warren also submits, in support of his argument that he has established "good cause", the testimony of Todd Brabec, involving background vocal performances. (Warren Affm. Resp. ASCAP Reply Mem. ¶ 3, Ex. D.) Because this testimony relates to Warren's new Protest, it will not be considered by the Court. He also submits the unsupported testimony of a member of ASCAP's Board of Directors, Douglas Wood, who he states admitted that

quests an explanation as to whether its members will take on added expenditures under the proposed Second Amended Final Judgment ("AFJ2")[4] that is going to be considered by this Court sometime later this year. He also questions why ASCAP does not provide to its members an accounting of its funds or the names and salaries of those persons overseeing them. Finally, Warren offers in support of his "good cause" argument, certain passages from the Department of Justice memorandum submitted in support of the AFJ2.

The Court finds that all of Warren's arguments, viewed individually and collectively, are inadequate to establish the requisite "good cause". First, in connection with the changing of information on the cue sheets by ASCAP, this Court agrees with ASCAP that it would be derelict in its duty if it did not correct erroneous information on the cue sheets. It would not be acting for the interests of the Society as a whole. When ASCAP changes the information on a member's cue sheet, that member has the right to inspect his own records and contest the changes. However, it does not follow that every member is given the right to inspect the financial records of all other members.

Without allegations of specific discriminatory conduct, Warren's statements are merely conclusory. If Warren had alleged even one concrete example of discriminatory conduct, "good cause" may have been proven. Indeed, ASCAP concedes as much. But no such showing has been made.

### i. *Denial of Due Process*

■ Warren argues that his due process rights were violated at the Protest held before the Board on August 3, 1999. He claims that ASCAP used documents, which he had previously requested, against him at the proceeding without informing him. Furthermore, he claims that his right to cross-examination was violated when, without informing Warren, ASCAP submitted a declaration in connection with the repertory taken over from BMI. ASCAP admits that there are no formal rules for discovery in connection with the Board's proceedings, but argues that Warren was given the opportunity to view all relevant information prior to the hearing.

Warren's claim is without merit. In *United States v. ASCAP (Karmen)*, 708 F.Supp. 95 (S.D.N.Y.1989), this Court rejected a claim that ASCAP's methods of dispute resolution violated his due process rights. Warren "has failed to demonstrate any state action which would trigger the applicability of the due process clause." *Id.* at 96. The procedures are internal, subject only to the appeal to the AAA. *See id.* "Although the federal government was a party to the Consent Decree which resolves an antitrust suit against ASCAP, the government has maintained no function in ASCAP's grievance procedures for disputes with its members." *Id.*

### B. *Membership Lists*

Section V(B) of the 1960 Order states that:

A list of all members and their mailing addresses shall be maintained and kept current by ASCAP and at the written request of any member, who has been a member for at least one year, shall be made available for inspection and copying during regular office hours by such member or any authorized representative of such member, provided, however,

---

the grievance procedures were not working. (Warren Affm. Resp. ASCAP Reply Mem. ¶ 2.) Because Warren has not provided any confirmation of this testimony and ASCAP contends that Wood has been misquoted and will submit an affirmation to that effect, this testimony is also excluded from the Court's consideration of this case.

**4.** ASCAP, in its coordinated effort with the Department of Justice to establish the AFJ2, is demanding that their Board, staff and administrators be allowed representation by legal counsel. Warren argues that this will result in a cost being borne by the members of the Society.

that if any member instructs ASCAP in writing not to make his address available, ASCAP shall not be required to permit inspection of such address but will forward to such member unopened any mail addressed to such member in care of ASCAP.

■ On July 12, 1999, Warren demanded that ASCAP provide him with the ASCAP membership list. On September 29, 1999, ASCAP offered to make the list available to Warren at its Los Angeles office, conditioned, however, upon the written assurance that he shall not "disclose the address of any ASCAP member to anyone or use the names and addresses of members for any purpose—commercial, political, or otherwise—other than contacting members regarding ASCAP purposes." (Meltzer–Zahn Aff., Ex. G.) Initially, Warren agreed to ASCAP's terms, but thereafter refused and the list has therefore been withheld.

ASCAP seeks to protect its members' names and addresses. This is the first time that either a member or a third party has requested the full membership list. ASCAP does not disclose the names and addresses of its writers to third parties, for fear that the information may be misused. It advises third parties to send all communications to the Society, which forwards the communications to the writers.

ASCAP fears that Warren will misuse the information provided in the membership list. Warren's disgust with ASCAP has led him to file several lawsuits in California in blatant disregard for the grievance procedures established by the governing documents. He has even requested the imposition of both civil and criminal sanctions upon certain ASCAP members.

ASCAP argues that the membership list was intended to be distributed solely in relation to ASCAP business, specifically, the elections of the Board of Directors. ASCAP relies upon the Government's memorandum, dated September, 2, 1959, submitted in support of its position in connection with the 1960 Order. It stated that:

> Since, in order to effectively make use of the rights granted in Sections IV(D) and (E) of the proposed Order, a member may find it desirable or necessary to have a mailing list of the Society's members, Section V(B) requires ASCAP to make such a list available at the written request of any member who has been a member for at least a year.

Sections IV(D) and (E) concern the elections of the Board of Directors.

Warren argues that the conditions imposed by ASCAP on disclosure of the membership list would constitute an amendment of the 1941 Consent Decree that bypasses the procedures established in the Articles of Association for such changes. He has repeatedly described such action as "blackmail" (Meltzer–Zahn Aff., Ex. G) and argues that ASCAP's purpose in making such a motion is to "cement their stranglehold over the organization and prevent the members from administering to their needs as they would see fit, giving power over the many to just a few." (Warren Affm. Opp. Mot. at 21.)

We do not agree that ASCAP's conditions constitute an amendment to the 1941 Consent Decree. The government required access to the list as an aid in the elections of Directors. Nor do we agree that the conditions constitute "blackmail" or are unreasonable. Corporate law has recognized similar conditions for several years. *See* N.Y. BUS. CORP LAW § 624(b) (McKinney Supp.2000). Therefore, unless Warren gives assurance that the information will be used only for a proper ASCAP-related purpose, it does not have to be disclosed to him.

## II. *Conflict of Interest*

■ The general rule is that an attorney's representation of two adverse parties is prima facie improper. *See Cinema 5 Ltd. v. Cinerama, Inc.,* 528 F.2d 1384, 1387 (2d Cir.1976). Prior to the Protest, War-

ren demanded that ASCAP's in-house and outside counsel recuse themselves from the proceedings, because their representation of ASCAP constituted a conflict of interest. Warren argues that ASCAP's counsel also represents him. Therefore, Warren refuses to proceed with the appeal to the AAA. In his view, this conflict so tainted his Protest proceeding that the decision should be rendered void and the Protest conducted again. In opposition, ASCAP argues that neither the Membership Agreement, New York law, the Professional Code of Responsibility, nor common sense required its counsel to recuse themselves from representing ASCAP in the Warren Protest.

Warren claims that the attorney-client relationship was established between himself and ASCAP's attorneys when he disclosed confidential information in order to receive advances against his future royalties. This information included, inter alia, his: total income; debts to credit card companies, stores, and the IRS; telephone and electric bills; and eviction notices. (Warren Evid. Supp. Affm. Opp. Mot., Exs. 6–1 to 6–3.)

Article XI of the Articles of Association states, in pertinent part, that AS-CAP's "Counsel shall be the legal adviser of the Society, the Board and various committees. He shall have supervision of all matters involving legal questions, and shall appear for the Society in all actions or proceedings." The provision specifically states that the counsel acts on the *Society's* behalf "in all actions or proceedings." This includes the representation of the Society in opposition to all members' protests pursuant to Article XIV, Section 4. Because the Articles of Associations are "the law of ASCAP binding upon all its members," *Gem Music Corp. v. Taylor*, 294 N.Y. 34, 60 N.E.2d 196, 198 (1945), there is no attorney-client relationship with the individual members. *See Franklin v. Dick*, 262 A.D. 299, 28 N.Y.S.2d 426, 429–30 (1941) (holding that unincorporated associations have broad discretion in prescribing its rules as long as the adopted rules are in accordance with law and all members agree), *aff'd*, 287 N.Y. 656, 39 N.E.2d 282 (1941). Although Warren argues that an opposite conclusion is required by Sections 4 and 5 of the Membership Agreement, we find that he has confused the concept of power of attorney with the concept of legal representation.[5]

**5.** In the instant motion, Warren relied solely upon Paragraph 5 of the Membership Agreement. (Warren Evid. Supp. Affm. Opp. Mot. ¶ 11, Ex. 5.) However, in a letter written by Warren to ASCAP on June 5, 2000, the basis for his argument rested on paragraphs 1(a), 2—4. (*Id.*, Ex. 6–5.) Paragraphs 1(a), 2—3 refer to copyright ownership, expiration date of the Membership Agreement, and ASCAP's promise to use good faith in connection therewith. These paragraphs do not deal with the issue of legal representation and will not be considered by this Court.

Sections 4 and 5 of the Membership Agreement state:

4. The *Owner* hereby irrevocably, during the term hereof, authorizes, empowers and vests in the *Society* the right to enforce and protect such rights of public performance under any and all copyrights, whether standing in the name of the *Owner* and/or others, in any and all works copyrighted by the *Owner*, and/or by others; to prevent the infringement thereof, to litigate, collect and receipt for damages arising from infringement, and in its sole judgment to join the *Owner* and/or others in whose names the copyright may stand, as parties plaintiff or defendants in suits or proceedings; to bring suit in the name of the *Owner* and/or in the name of the *Society*, or others in whose name the copyright may stand, or otherwise, and to release, compromise, or refer to arbitration any actions, in the same manner and to the same extent and to all intents and purposes as the *Owner* might or could do, had this instrument not been made.

5. The *Owner* hereby makes, constitutes and appoints the *Society*, or its successor, the *Owner's* true and lawful attorney, irrevocably during the term hereof, and in the name of the *Society* or its successor, or in the name of the *Owner*, or otherwise, to do all acts, take all proceedings, execute acknowledge and deliver any and all instruments, papers, documents, process and pleadings that may be necessary, proper or expedient to restrain infringements and recover damages in respect to

For the purposes of determining the existence of an attorney-client privilege, several district courts have held that "[e]ach individual member of the [unincorporated] association is a client of the association's lawyer." *Schwartz v. Broadcast Music*, 16 F.R.D. 31, 32 (S.D.N.Y.1954); *see Connelly v. Dun & Bradstreet, Inc.*, 96 F.R.D. 339, 341 (D.Mass.1982); *Philadelphia Housing Auth. v. American Radiator & Standard Sanitary Corp.*, 294 F.Supp. 1148, 1149–50 (E.D.Pa.1969); *United States v. American Radiator & Standard Sanitary Corp.*, 278 F.Supp. 608, 614 (W.D.Pa.1967); *see also Halverson v. Convenient Food Mart, Inc.*, 458 F.2d 927, 930 (7th Cir.1972) ("Because the lawyer in effect had represented and benefitted every [one of the unincorporated association's] franchisee, he could reasonably believe each one of them was his client.") The Second Circuit has refused to address the rule established by these cases. *See Glueck v. Jonathan Logan, Inc.*, 653 F.2d 746, 748 n. 3 (2d Cir.1981), *affirming*, 512 F.Supp. 223 (S.D.N.Y.1981) (Conner, J.). ASCAP has even conceded that "ASCAP's general counsel is the attorney for each of ASCAP's members for purposes of invoking the attorney-client privilege against a third party, where a member has requested association-related legal advice." (ASCAP Reply Mem. at 8.) However, that is not the issue in this case, which is whether the counsel may represent ASCAP in an action brought against it by a member.

We conclude that the counsel may do so. The principle that members of the association are the clients of the association's attorneys, finds its roots in the common law distinction between corporations and unincorporated associations. *See City of Kalamazoo v. Michigan Disposal Serv. Corp.*, No. 1:99 CV 338, 2000 WL 1874210, at *17 (W.D.Mich. Dec.20, 2000). Whereas the corporate entity, "the paradigmatic artificial 'person,'" has always been considered separate and independent from its constituents, the unincorporated association has not. *Id.* (quoting *Carden v. Arkoma Assocs.*, 494 U.S. 185, 187–88, 110 S.Ct. 1015, 1017, 108 L.Ed.2d 157 (1990)). As a result, attorneys for the corporation traditionally have not been held to represent its employees and attorneys for the unincorporated associations have been considered to represent their members. *See Kalamazoo*, 2000 WL 1874210, at *17; *Greate Bay Hotel & Casino, Inc. v. City of Atlantic City*, 264 N.J.Super. 213, 624 A.2d 102, 104 (1993); *see, e.g., Talvy v. American Red Cross of Greater New York*, 205 A.D.2d 143, 149, 618 N.Y.S.2d 25 (1st Dep't 1994) (holding that unless agreed otherwise, the attorney for the corporation does not represent its employees) (citing *Evans v. Artek Sys. Corp.*, 715 F.2d 788, 792 (2d Cir. 1983)).

However, in recent years, the law has reflected the influences of changing ethical codes. The mere status of being a member of an unincorporated association no longer makes one a client of the association's attorneys. *See In re Circle K Corp.*, 199 B.R. 92, 99 (Bankr.S.D.N.Y.1996), *aff'd*, Nos. 96 Civ. 5801, 96 Civ. 9479, 1997 WL 31197 (S.D.N.Y.1997); *see, e.g., Willig, Williams & Davidson v. Walters*, No. CIV. A. 93–0642, 1993 WL 224723, at *3 (E.D.Pa. June 22, 1993) (reversing prior holding based upon enacted legislation). *See also Westinghouse Elec. Corp. v. Kerr-McGee Corp.*, 580 F.2d 1311, 1319 (7th Cir.1978) (refusing to decide whether an attorney for a trade association, that does business as a non-profit association, represents every member of the association); *Greate Bay Hotel*, 624 A.2d at 106 (stating that contrary case law was established prior to the adoption of the ABA Model Rules in 1983); ABA Comm. on Ethics and Prof'l Responsibility, Formal. Op. 365 (1992) (holding that none of the cases that hold to

---

or for the infringement or other violation of the rights of public performance in such works, and to discontinue, compromise or refer to arbitration any such proceedings or actions, or to make any other disposition of the differences in relation to the premises.

the contrary are persuasive) [hereinafter "ABA Formal Op. 92–365"].

Disciplinary rules now generally refer to organizations, rather than corporations. *See* N.Y. CODE OF PROF'L RESP. D.R. 5–109 (2000); MODEL RULES OF PROF'L CONDUCT R. 1.13 cmt. ¶ 1 (1999) (stating that organizations include unincorporated associations). Furthermore, the Association of the Bar of the City of New York, Committee on Professional and Judicial Ethics has stated that "[t]here is no per se rule that representation of a trade association creates an attorney-client relationship with each member of the association, but the particular circumstances of the representation may create an attorney-client relationship with one or more of the members." N.Y.C. Assn. B. Comm. Prof'l and Jud. Ethics, Formal Op. 1 (1999) [hereinafter "N.Y.C. Ethics Formal Op. 99–1"]; *see* ABA Formal Op. 92–365 ("by representing the [trade] association a lawyer does not necessarily enter into a client-lawyer relationship with each member"); ABA Comm. on Ethics and Prof'l Responsibility, Formal Op. 390 (1995). The relevant factors concern the nature of disclosures to the attorney; the member's expectations of the attorney; the reasonableness of those expectations; whether the attorney had affirmatively assumed a duty to represent the member; whether the member had independent representation; whether the attorney represented the member prior to representing the association; and whether the member relied upon the attorney's representation of its individual interests. The size of the association can also be a factor in assessing the reasonableness of the member's expectations. *See* N.Y.C. Ethics Formal Op. 99–1 (citing, inter alia, *Westinghouse*, 580 F.2d at 1319–20; ABA Formal Op. 92–365); *see also* ROBERT A. BARKER & VINCENT C. ALEXANDER, 5 EVIDENCE IN NEW YORK STATE AND FEDERAL COURTS § 501.1(b) (1996) ("The client's belief is the principal factor.").

Analysis upon of the factors discussed in the ethics opinions reinforces the conclusion that no attorney-client relationship existed between ASCAP's attorneys and Warren. It is well settled that in order to establish an attorney-client relationship, the person must contact the attorney for the purposes of seeking legal assistance. *See Matter of Priest v. Hennessy*, 51 N.Y.2d 62, 431 N.Y.S.2d 511, 409 N.E.2d 983, 986 (1980); *Doe v. Poe*, 189 A.D.2d 132, 595 N.Y.S.2d 503, 504 (2d Dep't 1993), *leave denied*, 81 N.Y.2d 711, 600 N.Y.S.2d 442, 616 N.E.2d 1104 (1993); *see generally* BARKER & ALEXANDER, *supra*. Warren's disclosure of information was not made in the pursuit of legal advice. It was disclosed in an effort to obtain advances against his future royalties. Warren's debts are in no way relevant to the issues raised in the Protest.

Although this financial information may have been personal to Warren, because it was disclosed in order to receive advances from ASCAP, there was no reasonable expectation that the ASCAP attorneys would keep the information from the Society. Rather, it was expected that it would be disclosed to the Society in order for Warren to receive those advances. *See Allegaert v. Perot*, 565 F.2d 246, 250 (2d Cir. 1977) (refusing to disqualify an attorney who represented an entity and its employee jointly because there was no expectation of confidentiality).

Even if Warren had the subjective view that ASCAP's attorneys would represent him in the Protest and the events leading thereto, we do not find such expectation objectively reasonable. The Articles of Association put members on notice that ASCAP attorneys would act on the Society's behalf in opposition to all members' protests.

The Society is comprised of over one hundred thousand members. Although the size of the association is not the determining factor, as stated above, it is relevant in determining reasonableness of expectations. It would defy common

sense to believe that the attorneys for ASCAP also represent every one of these members. It would force ASCAP attorneys to recuse themselves from all member protests and require new attorneys to familiarize themselves with the governing documents and internal workings of AS-CAP in order to effectuate a meaningful representation of the Society. *See In re Circle K Corp.*, 199 B.R. at 99–100 (refusing to disqualify an attorney based upon practical effects of an attorney's representation of a creditors' committee). Furthermore, ASCAP's counsel had never represented Warren prior to the Protest. Disciplinary Rule 5–109 provides that an organization's attorney must inform an employee that it represents the organization when the employee's interests seem adverse to the organization. ASCAP's counsel fully complied with that requirement. When ASCAP was made aware of Warren's belief that counsel's representation of ASCAP constituted a conflict of interest, counsel informed him that they were not representing him but ASCAP. Warren attempts to establish that he had informed ASCAP on July 15, 1988, that their counsel had been acting for him. (Warren Evid. Supp. Affm. Opp. Mot., Ex. 6-4.) However, this letter merely requests ASCAP's counsel to negotiate a deal with CBN Cable Network in order to produce more royalties from the airing of an episode of *Remington Steele*. It does not indicate that Warren believed they were acting as his individual counsel and not on behalf of ASCAP. Warren's intentions were made clear in a letter dated July 14, 1999, when he specifically stated that ASCAP's counsel should be barred from representing it in further proceedings. In response, ASCAP promptly gave the notice required by Disciplinary Rule 5–109.[6] (Reimer Aff. ¶ 2; Ex. D.) Therefore, Warren had no reasonable expectations that ASCAP's counsel was acting as his attorney.

ASCAP also relies upon the Second Circuit holding in *Glueck*, that an attorney of an incorporated trade association can represent a third party against one of the association's members, if the member is only a "vicarious client." 653 F.2d at 746. The Court of Appeals stated that the strict disqualifying standards of adverse representation are not invoked unless "a lawyer undertakes to represent two adverse parties, both of which are his clients in the traditional sense." *Id.* at 749. If the member is a "vicarious" client, these considerations do not apply. *See id.* Whether a member is merely vicarious depends upon whether the subject matter of the third party's suit was substantially related to the matters on which the attorney represents the association. The court adopted a substantial relationship test to determine if disqualification under Canon 5 was warranted:

> Disqualification [of an associations's law firm against an association member] will ordinarily be required whenever the subject matter of a suit is sufficiently related to the scope of the matters on which a firm represents an association as to create a realistic risk either that plaintiff will not be represented with vigor or that unfair advantage will be taken of defendant.

653 F.2d at 750.

The application of the substantial relationship test established in *Glueck* con-

---

**6.** Warren argues that ASCAP's counsel attempts to "sit on both sides of the fence," and relinquish legal responsibility when it pleases. (Warren Affm. Opp. Mot. at 30.) Warren has recently requested ASCAP's counsel to file suit against Christian Broadcasting Network and Princess Cruises concerning copyright infringement and unpaid royalties. ASCAP declined to file suit and advised Warren: "As every member of ASCAP has the right to proceed on his own in cases of infringement, you are free to pursue such claims against Princess Cruises. Should you decide to do so, I strongly suggest that you seek the assistance of counsel." (Reimer Reply Aff. ¶ 3, Ex. C.)

This argument is without merit. ASCAP's counsel advised Warren to seek legal assistance if he decided to pursue a lawsuit. The Court does not understand how this supports Warren's claimed "conflict of interest."

firms that there was no reason to disqualify ASCAP's attorneys. ASCAP has never represented Warren individually or in any manner that would invoke the *Glueck* analysis. At most, Warren is only a "vicarious" client of ASCAP's counsel.

There was no attorney-client relationship established and no resulting conflict of interest. Accordingly, the Protest does not have to be conducted again and ASCAP's counsel do not have to recuse themselves from representing ASCAP during Warren's appeal of the Board's decision.

## III. *Injunction and Mandatory Exhaustion of Administrative Remedies*

### A. *Exclusive Jurisdiction*

This Court has exclusive jurisdiction over those claims concerning the interpretation, modification, and enforcement of the terms of the 1941 Consent Decree, AFJ and the 1960 Order. Section XVII of the AFJ provides:

> Jurisdiction of this cause is retained for the purpose of enabling any of the parties to this Amended Final Judgment to make application to the Court for such further orders and directions as may be necessary or appropriate in relation to the construction of or carrying out of this Judgment, for the modification thereof, for the enforcement of compliance therewith and for the punishment of violations thereof.

### 1. *Injunction Granted*

■ ASCAP is seeking to enjoin Warren from filing any further actions in California state court seeking interpretation, enforcement or modification of the 1941 Consent Decree, AFJ and 1960 Order. ASCAP finds support in two Second Circuit decisions, *United States v. ASCAP (Zekley)*, 442 F.2d 601 (2d Cir.1971) and *United States v. ASCAP (Karmen)*, 32 F.3d 727 (2d Cir.1994).

In *Zekley*, two members of ASCAP filed suit in California to enjoin ASCAP's proposed distribution of a fund. The Second Circuit affirmed this Court's injunction of the state proceedings because the antitrust policies of the 1941 Consent Decree, AFJ and 1960 Order would be frustrated by inconsistent state court decisions. *See* 442 F.2d at 603 (" 'Federal injunctive relief may be necessary to prevent a state court from so interfering with a federal court's consideration or disposition of a case as to seriously impair the federal court's flexibility and authority to decide that case.' ") (quoting *Atlantic Coast Line R. Co. v. Brotherhood of Locomotive Engineers*, 398 U.S. 281, 295, 90 S.Ct. 1739, 1747, 26 L.Ed.2d 234 (1970)).

In *Karmen*, an ASCAP member petitioned this Court to vacate the AAA's award on the grounds that it was not 'final and definite' under Article 75 of the N.Y. C.P.L.R. and Section X of the Federal Arbitration Act. Civ. 13–95, 1992 WL 167383, at *2 (S.D.N.Y. June 26, 1992), *aff'd*, 32 F.3d 727 (2d Cir.1994). We denied the petition. *See id.* at *4. Karmen later argued that this Court lacked subject matter jurisdiction over the motion Karmen had brought. 832 F.Supp. 82, 84 (1993), *aff'd*, 32 F.3d 727 (2d Cir.1994). He claimed that the matter should have been decided by a state court in connection with a contract action. *See id.* at 85. Although the award was based upon a contract, we held that a motion to vacate or modify the AAA's award involved the interpretation, construction, and enforcement of the 1941 Consent Decree, AFJ and 1960 Order. *See id.* at 85–87. The Second Circuit affirmed stating that "[t]he pertinent issue is whether Karmen's motion to vacate the arbitration award, if resolved in a New York state court, would pose a significant risk of frustrating the district court's jurisdiction over the consent judgment." 32 F.3d at 731.

We do not see any reason why the same analysis should not be applied in this case. Warren has repeatedly filed actions in California raising the same issues and seeking the same relief as his Protest. The actions have concerned, inter alia, the discovery of

ASCAP's documents and the membership list as well as the imposition of sanctions for failure to comply with such discovery. However, these claims have merely been recast under different legal theories, such as, breach of contract or breach of fiduciary duty.

Although Warren claims that ASCAP's requested relief is vague, it is quite clear that he understands what is intended. Warren's claims require the interpretation of Sections V(B), (C), and (D) of the 1960 Order. Warren's lawsuits have posed the question as to why he should be required to pursue an appeal to the AAA. He has even requested the California state court to construe the 1941 Consent Decree and AFJ according to the rules of the state in which a member is domiciled. (Reimer Aff., Ex. A.) These are clearly issues concerning the enforcement and interpretation of the 1941 Consent Decree, AFJ and 1960 Order. For example, different interpretations of the 1941 Consent Decree based upon different members' domiciles may create inequities among the members.

The Court does not doubt that Warren's repeated lawsuits pose "a significant risk of frustrating [this Court's] ... exclusive jurisdiction" over the 1960 Order. Accordingly, Warren must be enjoined from filing any further state actions that seek substantially similar relief. Furthermore, the state action currently pending before the Superior Court, County of Los Angeles, is also stayed. As this injunction is "necessary in aid of its jurisdiction," there is no violation of 28 U.S.C. § 2283. *See generally Zekley,* 442 F.2d at 601. The Court rejects any claim by Warren that this constitutes a deprivation of Warren's constitutional rights.

Finally, Warren argues that the establishment of the AAA may be legally unjustified according to United States Supreme Court and California state precedent. Although ASCAP attempts to determine the cases to which Warren is referring, this Court will not engage in such speculation. Warren has no standing in this Court to challenge the constitutionality of the AAA, or the impartiality of its members. This Court has the utmost respect for the distinguished persons appointed to the panel in this case and urges Warren to pursue his grievances in accordance with the procedures established by the Articles of Association. Finally, Article XIV, Section 6 of the Articles of Association states that: "All panel proceedings shall be held in New York." Accordingly, the proceeding must be held in New York.

## CONCLUSION

For the above stated reasons, ASCAP's motion is granted. First, pursuant to Section V(C) of the 1960 Order Warren is entitled to inspect his financial records but ASCAP is not required to conduct any elaborate compilations of data at his request. Second, Warren has not satisfied the requisite "good cause" pursuant to Section V(C) of the 1960 Order and AS-CAP will not be ordered to permit Warren to inspect and copy other members' financial records. Third, Warren may inspect and copy the membership list pursuant to Section V(B) only if he commits to use such information solely in connection with ASCAP matters. Fourth, Warren has failed to establish an attorney-client relationship with ASCAP's attorneys. Accordingly, the Protest does not have to be conducted again and ASCAP's attorneys do not have to recuse themselves from the upcoming appeal. Finally, if Warren wishes to pursue an appeal from the decision of the Board, he must do so before the AAA in New York City. He is hereby enjoined from filing any other actions that seek interpretation, enforcement or modification of ASCAP's governing documents. The state action filed in Superior Court, County of Los Angeles is also enjoined from further proceedings.

SO ORDERED.